Whitaker, Judge,
delivered the opinion of the court:
On and after November 2, 1942, Frank P. Kagonese and Joseph V. Scaravelli were partners doing business as the Square Construction Company. The partnership will be hereafter referred to as .the Square Construction Company, and for the purposes of this opinion will be treated as an entity. It sues for excess costs incurred by reason of encountering quantities of underground water, in the construction of a sewer under a contract with the defendant, in an amount which it says it had no reason to expect.
Plaintiff says, first, that by reason of this it is entitled to an equitable adjustment under article 4 of the contract, because of an unknown condition; or, in the alternative, that it is entitled to its excess costs incurred on account of it, because the defendant concealed from it the existence of this water and thus prevented plaintiff from including in its bid an amount to take care of it.
1. As to whether or not plaintiff is entitled to an equitable adjustment under article 4 of the contract. Article 4, which refers to “Changed Conditions,” provides that the contractor is entitled to an equitable adjustment if he “encounter[s], or the Government discover [s], during the progress of the work subsurface and/or latent conditions at the site mate *159 rially differing from those shown on the drawings or indicated in the specifications.” Did the existence of this water materially differ from the subsurface conditions shown on the drawings or indicated in the specifications ?
The defendant employed the Raymond Concrete Pile Company, Gow Division, to make 16 Gow test borings along the proposed sewer line. The plans and specifications set out the character of the soil disclosed by these borings, but said nothing one way or the other about subsurface water. It, therefore, cannot be said that the contractor encountered subsurface or latent conditions materially differing from those specifically shown on the drawings or indicated in the specifications.
It is true that the consulting engineers had made two bor-ings with an earth auger along the proposed sewer line, and that in one of them they had encountered wet clay, but the consulting engineers had abandoned undertaking to make any further borings and had employed the Raymond Concrete Pile Company to ascertain the subsurface conditions. The drawings and specifications made no specific representation as to subsurface water discovered by the Raymond Concrete Pile Company. Since the borings made by this company were the borings which purported to show conditions along the sewer line, and since they did not indicate whether or not there was subsurface water, it cannot be said that the conditions encountered were different from those shown on the drawings or specifications.
However, article 4 further provides that if the contractor encounters “unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications,” then in that event the contractor is entitled to an equitable adjustment. Do the conditions encountered come within this clause of article 4?
The sewer line was 5,400 feet long. It commenced on the north with its junction with a sewer in Patapsco Avenue, in Baltimore, Maryland, and ran westerly about 360 feet; thence southerly about 2,750 feet; thence southwesterly approximately 1,400 feet; thence southerly about 370 feet; and thence *160 westerly about 600 feet, where it joined a sewer at Curtis. Avenue. Where the sewer line joined the Patapsco Avenue' sewer it was less than 100 feet from an open body of water,, known as Stonehouse Cove, which is an arm of Chesapeake-Bay. For about one-half of its length it ran parallel with. Stonehouse Cove and so close to it that when the tide was-abnormally high, water from the cove overran about 200' feet of the route of the sewer.
The bottom of the sewer was from 20 to 45 feet below the surface of the ground, and for 4,800 feet of its total length of 5,400 feet it was below the level of the nearby sea. The-only portion of it that was above sea level was the last 600-feet where the sewer turned westerly and ran uphill to. Curtis Avenue.
The location of the sewer so close to Chesapeake Bay tends to indicate the probable presence of water in the line of the-proposed sewer; but the proof shows that this is not necessarily so. Many times subsurface water is encountered where-no body of surface water is nearby, and often it is not encountered when open water is nearby. Clay strata often interposes a wall which diverts water from its expected-course.
However, the other three contractors who bid on this job-expected to encounter water and included substantial sums-in their bids to take care of it.
On the other hand, this plaintiff had constructed another sewer line in this general vicinity, at Wagner’s Point, where-it had encountered only a small amount of subsurface water. This sewer line was only about 2,000 feet farther away from the Bay than the site of the one under consideration in this case. ,
Again, the defendant’s report of the findings of the Raymond Concrete Pile Company on the borings made by them showed no subsurface water, whereas it is customarily shown by them when they encounter it, and this fact was well known to contractors, including plaintiff.
When these things are balanced one against the other, it is hard to say whether or not unusual conditions were encountered materially differing from those ordinarily encountered. It is true the consulting engineer and defendant’s *161 •construction engineer found that such conditions had been .encountered, and so wrote the contracting officer on January .29, 1944; but their finding was never approved by the contracting officer.
2. Although it is not easy to determine whether or not article 4 conditions were encountered, it is nevertheless true that defendant did withhold from plaintiff information in its possession which would have warned plaintiff that it was ¡apt to encounter large quantities of excess water. The summary report of the Raymond Concrete Pile Company showed that in boring No. 1 a water level was reported at 9 feet below ground surface. As heretofore stated, the sewer line was from 20 to 45 feet below ground surface. In boring No. 3 •a water level was reported at 10 feet below ground surface. In boring No. T a water level was reported at 7 feet 3 inches below ground surface. In boring No. 15 a water level was reported at 19 feet below ground surface, and in boring No. 16 ¡a water level was reported at 12 feet 6 inches below ground .surface. No water level was shown on the summary report for the other 11 borings, because when this company came to take the water level at these borings, the holes had caved in so that the water level could not be accurately measured. In •driving many of the other 11 holes, however, subsurface water was encountered.
None of this information was furnished plaintiff. Had plaintiff had this information, that the water level in 5 of the 16 borings was much above the depth at which the sewer was to be laid, and had it been advised that water was encountered in many of the other 11 borings, but that the accurate water level at them could not be taken because the holes had caved in,[1] all of which information was in defendant’s possession, it would have been put on notice that it probably would encounter large quantities of water above, and in some cases considerably above, the bottom of the sewer line.
Defendant not only did not furnish plaintiff with this information, but it said, in effect, that it did not have knowledge •of the existence of this water, because it said that the infor *162 mation which it had furnished on subsurface conditions “represents the best information available.”
Defendant undertakes to justify the withholding of this information on the ground that it was potentially misleading. It says that if it had told plaintiff that water had been discovered in 5 of the 16 borings, plaintiff would naturally have concluded that water had not been encountered in the other 11; but this is not true, because defendant could and should have also informed plaintiff that it could not give it accurate information relative to the water level on these other 11 holes because the holes had caved in, but that in driving a number of them water had been encountered.
We do not think it can be doubted that defendant did withhold from plaintiff material information, and that there was no justification for its doing so.
However, plaintiff has not made out a case unless it can show that the withholding of this information in fact misled it. If plaintiff should have known that it would encounter large quantities of water, although this information was withheld, then it cannot be said that it was misled.
There is a good deal in the record that tends to show that plaintiff should have known that it would have encountered water, as we have pointed out above, to wit, the close proximity of Chesapeake Bay, the fact that the bottom of the sewer was below sea level, that the last 600 feet of it ran uphill, indicating that the drainage was toward the sewer line, and the fact that the other bidders expected to encounter large quantities of water. On the other hand, we have the fact that plaintiff had constructed another sewer about 2,000 feet from the site of this present sewer, where it did not encounter large quantities of water, and the fact that it was known that the Raymond Concrete Pile Company, a firm of excellent reputation for accuracy, had made these bor-ings, and that defendant had not reported that they had discovered any water, although the Pile Company was called on to report water if it did encounter it.
It is, therefore, difficult to say whether or not plaintiff should have expected to encounter large quantities of water. But plaintiff says that, in fact, it did not expect to, and we cannot say that this is untrue. Plaintiff, at least, had rea *163 sonable grounds to believe that it would not encounter excessive water. Certain it is, that if the defendant had furnished it with the information it had in its possession, it would have expected to encounter the water. This would have removed all doubt.
Since defendant was confessedly remiss in not having given plaintiff this information, and since the preponderance of the evidence shows that the withholding of this information did mislead plaintiff, we think it is entitled to recover the excess cost to which it was put by reason of the encountering of this water. The withholding of this information, especially in view of its representation that it had given bidders the best information available, was a breach of contract. See United States v. Atlantic Dredginq Co., 253 U. S. 1, 9-11.
It might also be said that plaintiff’s bid was between $65,000 and $10,000 below the next lowest bid, due in part to its omission to include items to care for large quantities of water. If the amount which we allow as damages for the withholding of this information be added to its bid, it is still $44,196.61 lower than the next lowest bid.
3. The amount which plaintiff is entitled to recover is not easy to determine.
Our best guide is the recommendation of the consulting engineers and the construction engineer of the Federal Works Agency, who, after investigating the situation, prepared a Change Order providing for an additional payment to plaintiff of $24,145.09. This amount was agreed to by plaintiff.
The sum was arrived at by including, first, the rental and freight for the well points which it was necessary for the contractor to use in the open trench section of the sewer to dispose of this water, the expense of the factory representatives superintending the installation and operation of these well points, the cost of their installation and operation, and the cost of maintenance and the pumping, plus a 6 percent allowance for overhead and profit, making a total of $13,-141.19; and, second, the cost of removing the water from the tunnel sections by the use of compressed air. The removal of the water from the tunnels, in which portions of the sewer were laid, by compressed air required the installation of steel *164 liner plates and grouting between them to make the tunnel more or less airtight. The total cost of the compressed air operation was $11,003.90, including 6 percent for overhead and profit. This did not include the excess cost of the steel liner plates over the timber provided for in the specifications, which we think was proper, because plaintiff seems to have intended from the beginning to use steel liner plates in lieu •of the timber, which was permitted by the specifications, but at no extra cost. It ordered these plates within a few days .after the work started, and the contracting officer permitted the use of them with the understanding that no excess cost would be claimed.
The total recommended for allowance to cover the cost of the well points and the compressed air operation, plus overhead and profit, was $24,145.09.
However, although the construction engineer of the Federal Works Agency had joined in the recommendation of the issuance of Change Order No. 10, providing for an additional payment to plaintiff of $24,145.09, he sent in a report accompanying the Change Order, stating that plaintiff was probably entitled to only $12,881.63, instead of $24,145.09, which he had recommended. He arrived at this figure by reducing the amount allowed for the use of well points, and by eliminating altogether the allowance for the use of compressed air in the tunnels, except the item of $1,984.28 for grouting.
Why the construction engineer of the Federal Works Agency made these inconsistent recommendations is not explained. We are at a loss to understand why plaintiff would not be entitled to payment for the use of compressed air to •eliminate the water in the tunnels if it was entitled to the cost of the well points to dispose of the water in the open trenches.
It seems to us that the recommendation of the consulting engineer for the payment of the amount stated in the Change ■Order of $24,145.09, originally concurred in by the construction engineer of the Federal Works Agency, and originally ■agreed to by plaintiff, comes about as near to the amount to which plaintiff is equitably entitled as any other figure suggested by the record.
*165 Defendant takes the position that the findings of the contracting officer, affirmed on appeal, were final, but, if we assume that they are final on the question of plaintiff’s right to an equitable adjustment under article 4,[2] they are certainly not final on the question of whether or not defendant, breached its contract by withholding material information,, and representing that the information furnished was the best available.
Defendant concedes that it is indebted to the plaintiff on the contract in the sum of $2,634.62. This is in addition to its liability for excess costs incurred due to the withholding of this information.
Judgment will be entered in favor of plaintiff in the sum of $26,779.71.
It is so ordered.
MaddeN, Judge; LittletoN, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff is and at all times hereinafter mentioned was a copartnership composed of Frank P. Ragonese and Joseph V. Scaravelli, trading under the firm name of Square Construction Company, and having offices in Baltimore, Maryland.
2. On November 2, 1942, the defendant, through the Federal Works Agency, hereinafter referred to as the FWA, issued invitations for bids for the construction of a defense public works sewer project in Baltimore’s Curtis Bay area. The project was designated Curtis Bay Intercepting Sewer,. No. Md. 18-135. Its primary purpose was to furnish urgently needed sewer facilities in that heavily industrialized section where much critical wartime production was then in *166 progress.[3] Addenda No. 1, dated November 6, 1942, and Addenda No. 2, dated November 9, 1942, were mailed to prospective bidders from Kichmond, Virginia, on those dates.
3. As designed, the intercepting sewer was approximately 5,400 feet long. Commencing on the north where it joined an existing outfall sewer at Patapsco Avenue about 100 feet from an open body of water known as Stonehouse Cove, it ran for approximately 360 feet in a westerly direction. Then it ran for approximately 2,750 feet in a southerly direction, more or less parallel to Stonehouse Cove. A small portion of the proposed sewer route, about 200 feet, would sometimes be covered with a foot of water if the tide was abnormally high.
Thereafter the sewer headed in a southwesterly direction for approximately 1,400 feet, under various sets of railroad tracks leading to and from several industrial facilities. Then for approximately 370 feet it ran in a southerly direction to Benhill Avenue, where it turned almost due west and after traversing a distance of approximately 600 feet, joined the existing 21 inch sewer at Curtis Avenue.
As designed, there were approximately 600 feet of 21-inch vitrified pipe sewer in tunnel; 1,584 feet of 42-inch concrete sewer in tunnel and 3,221 feet of 42-inch sewer in open cut. Proposed excavation depths in the open cut ranged from 20 feet to about 31 feet below ground surface. Proposed excavation depths in the tunnel portions ranged from about 25 feet to about 45 feet below ground surface. The invert, or bottom, of the sewer was slightly below the level of the nearby sea for over 4,800 of the sewer’s 5,400 feet. The portion where the sewer’s invert rose above sea level was for a distance of 600 feet up Benhill Avenue to Curtis Avenue.
*167 4. Pursuant to the invitation for bids plaintiff executed ■and submitted a proposal on a unit price basis to furnish all labor and materials and perform all work as required by -and in strict accordance with the contract documents, schedules, and drawings for the sum of $256,550.00.
On November 12, 1942, bids which were received were publicly opened and read at FWA’s Region No. 2 office in Richmond, Virginia. Plaintiff’s bid was the lowest received. By letter dated November 12, 1942, the Regional Director, hereinafter referred to as the Contracting Officer, notified plaintiff that its unit price bid had been accepted and expressed FWA’s intention to award plaintiff the contract. By another letter of the same date, the Contracting Officer notified plaintiff to proceed with construction as of November 16, 1942, and therein gave expression to the understanding that plaintiff would complete all work within 120 consecutive ■calendar days, beginning November 16, 1942. Plaintiff commenced construction on November 23, 1942, although the formal contract was not executed by plaintiff and returned to the Contracting Officer until December 19, 1942.
5. The contract provided in part as follows:
Aeticle 4. -Changed conditions. — Should the contractor encounter, or the Government discover, during the progress of the work subsurface and/or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications, the attention of the contracting officer shall be called immediately to such conditions before they are disturbed. The contracting officer shall thereupon promptly investigate the conditions, and, if he finds that they do so materially differ, the contract shall with the written approval of the head of the department or his duly authorized representative, be modified to provide for any increase or decrease of cost and/or difference in time resulting from such conditions.
*****
Article 15. Disputes. — Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the contracting officer subject to written *168 appeal by the contractor within 30 days to the head of' the department concerned or his duly authorized representative, whose decision shall be final and conclusive-upon the parties thereto. In the meantime the contractor shall diligently proceed with the work as-directed.
6. The specifications provided in part as follows:
SPECIAL PROVISIONS
A. Note. — Subsurface soil data is shown on the-drawings and represents the best information available. The Government assumes no responsibility as to their accuracy or comprehensiveness. Samples of the boring material may be seen at the ofiice of the Architect-Engineer, Perring and Eemington, 10 West Chase St., Baltimore, Maryland.
Jj« # S[< sji #
8. FLUSHING OR GROUND WATER NOT TO BE DISCHARGED-into existing seweRs : The contractor shall not discharge into existing sanitary sewers, any flushing or ground! water or any material of any nature, either during the construction of the sewers to be built under this contract or in the course of the final inspection.
# # # Jje
DETAILED SPECIFICATIONS
A. Excavation
1. Excavation Unclassified. — All excavation required to complete this contract will be unclassified; that is, the unit prices bid for excavation shall be taken to-include and cover all materials required to be excavated whether dry or wet, and regardless of the character of the materials.
2. Excavation in Tunnel. — * * *
(b) All methods of tunneling, including the use of metal lining or other supporting methods, will be satisfactory subject to approval, but shall be changed from time to time at the cost of the Contractor, if the conditions so require and he is directed. Tunnel excavations-shall have dimensions such as will permit the sewers, for their full dimensions, to be properly constructed therein. The Contractor, shall, however, before starting-work, submit, for approval, a drawing showing the cross section of the tunnel he proposes to excavate, and shall also indicate on said drawing all dimensions and the size- *169 and arrangement of all timbering, bracing, or other supporting materials.
Sji # si* # *
6. Payment for Excavation and Refill Below Sub-grade. — * * *
(b) In case the grade or elevation of the sewer is lowered so as to require a greater depth of trench than that shown on the plans, payment will be made for the excavation made necessary by such lowering of the grade or elevation, at the unit price bid for excavation below sub-grade ; but the Contractor shall not be entitled to extra compensation on account of the extra amount of back-filling, sheeting, shoring, bracing, bailing or pumping required because of such lowering.
* * * i» *
_ 11. Pumping. — The Contractor shall keep all excavation, in trench and tunnel, free from water at his own cost and expense during the progress of his work. He shall build all dams and other work necessary for this purpose, and shall provide and keep in operation on the work, when necessary, a pump or pumps of sufficient capacity to keep the excavation dry and free from water at all times.. He shall provide for the disposal of the water removed from the excavations in such a manner as shall not cause injury to the public health, public or private property, or to any portion of the work completed or in progress, or to the surface of the streets.
*****
20. Measurement and Payment For Excavation.— (a) The excavation for all sanitary sewers, in open trench and tunnel, whether wet or dry, whether in earth, rock or whatever character of material encountered will be paid for by the linear foot at the unit prices bid.
* * * * *
(d) Excavation shall include and cover the excavating of all materials; the handling, storage and disposal of the surplus excavated materials; all pumping, bailing and disposing of water; all refilling, all sheeting, shoring and bracing of trenches; all timbering, bracing, or metal lining or other supporting materials in tunnels; the support of all tracks, rails, buildings, curbs, sidewalks, pipes, conduits, or other structures and the restoration of same in case of settlement or other injury; restoration of roadways as directed; all excavation for shafts and manholes, together with the cost of *170 timbering in same, the furnishing of all labor, tools,, equipment and materials necessary to perform the work, in accordance with the plans and other contract documents.
(e) Prices bid, whether by linear foot of tunnel or trench, cubic yard, or in lump sum items which include-excavation, shall include all the factors in paragraph-id).
B. UNDERDRAINS
1. Scope. — (a) An underdrain shall be laid beneath the sewer where directed. Underdrain shall be of the size shown on drawings, and laid to the lines and grades as directed. It shall consist of vitrified pipe, as called for on the plans and shall be laid at such a depth below the subgrade of the sewer as will insure the work above being absolutely dry during construction.
*****
(c) The underdrain shall be kept absolutely clear from earth, dirt or any solid material during construction, and when completed the same shall be clear and free from all foreign material as required for the sewer herein specified. The underdrains, wherever laid, are to be considered as integral part of the sewer and not as-mere temporary expedients to assist in laying the sewer or to insure dry conditions during construction.
(d) The underdrains under successive sections of the-sewer are intended to form a continuous drain under the whole length of the sewer, unless otherwise directed. The Contractor shall furnish and set in place all branches- and spurs which may be required for the connection of underdrains of branch sewers, without charge therefor. The use of underdrains does not in any way or to any-extent relieve the Contractor of any of his obligations under the contract documents to pump, bail and/or-otherwise dispose of water at his own expense so as to-keep the excavations dry during the progress of the-work.
7. On Sheet 6 of the contract drawings the following notes-appeared:
Borings made by Raymond Concrete Pile Co. — Gow Division. These borings are wash borings with samples taken with spoon. Samples may be examined at Perring; & Remington, 10 W. Chase St., Baltimore, Maryland. * * *
Information on this sheet regarding existing subsurface earth conditions, as indicated by test borings, is= *171 shown, for the convenience of the Contractor only, and the accuracy of this information as shown hereon is in no wise guaranteed. The Contractor must verify all such information to his own satisfaction.
8. In addition to giving a picture of the entire sewer line, in terms of general location, Sheet 6 also set forth graphically cross sections of 18 test borings. The cross sections of two of the 18 borings — designated 4A and 6A — were specially noted as being “Made with earth auger.”
All 18 cross sections gave descriptive information concerning the types of subsurface soil found at various elevations in each of the 18 holes. However, they did not portray any subsurface water levels.
The location of each boring was shown on Sheet 6 as so-many-feet-distant from the northeasternmost point where the sewer was to join the Patapsco Avenue outfall sewer. For example, above the cross section of Boring No. 2 was the legend “sta. 7+70”, the undisputed meaning of which was that that boring was made 770 feet from the point where this sewer was to join the Patapsco Avenue outfall sewer.
The boring cross sections portrayed on Sheet 6 also contained the following information concerning the relative locations of the invert (bottom) of the proposed sewer, ground level elevation and the level of the nearby sea:

*172 From the 18 boring cross sections shown on Sheet 6 the soil appeared to be composed of considerable sand with various clay strata, some gravel, but not rock.
9. To supervise this project as Consulting Engineer, defendant hired Perring & Remington of Baltimore, Maryland, the same firm which had acted as Architect/Engineer in drawing up the plans and specifications for this job. Perring & Remington delegated the responsibility of Field or Resident Engineer to Mr. Charles B. Clark of their staff. The FWA representative most frequently on the site during the course of construction was Mr. James F. Booth, assigned :as FWA Construction Engineer.
10. By November 23, 1942, plaintiff had moved men and equipment to the area. At that time it had on the site two 6-inch and one 4-inch centrifugal pumps. Plaintiff commenced excavation work that morning just south of Patapsco Avenue in the open trench portion at about station 5+00. Within one hour after digging down about six or seven feet plaintiff encountered a large amount of subsurface water, which necessitated the use of a well point system in order to adequately dewater the open trench area. On November 28, 1942, plaintiff rented a well point system, including three special well point pumps which were delivered to plaintiff on December 1,1942.
11. The well points here involved were hollow metal pipes about 40 inches long, pointed at the lower ends to facilitate driving, and having screen holes in their side walls extending upward. Plaintiff installed these well points by employing water pressure to jet them into the soil on one or both sides of the proposed excavations, as conditions required, so that their depth was below the bottom of the open trench. Such additional pipe as needed was added to the upper ends of the well points. The uppermost ends of these added pipes were connected with a master suction pipe lying horizontally on the surface of the ground, parallel with the line of the trench. This pipe was in turn connected to an 8 inch well point pump which drew the water from the ground and ejected it a considerable distance from the trench.
During the first week of construction, plaintiff excavated 75 linear feet of open trench without the aid of well points. *173 By the end of the second week with the aid of well points plaintiff excavated another 100 linear feet.
On December 16,1942, plaintiff reported to the Construction Engineer that it was encountering more subsurface water than it had expected. However, by December 17, 1942, the situation had greatly improved, the well points apparently having tapped a reservoir of subsurface water.
After the well points were installed, work in the open trench portion of the project was not delayed to any appreciable extent by the subsurface water encountered.
Plaintiff installed and used well points along the open trench portion and beside certain tunnel shafts during the following periods:

Week Ending

From,— To—
December 5,1942 December 19, 1942
January 2,1943 February 29, 1943
June 12, 1943 June 26, 1943.
This equipment remained on the site under rental until the latter part of June 1943. The well point system while in use was maintained in operation by mechanics or operators usually 24 hours a day and gas and oil were required in connection with its operation.
12. On December 19, 1942, plaintiff notified the Contracting Officer in writing that it was encountering subsurface conditions materially different from those which it had expected and requested a prompt investigation. It reported “an extremely serious and difficult water condition * * * along the line of excavation * * Plaintiff also therein stated:
* * * Under the circumstances, and while proceeding with the work, we feel it to be incumbent upon us to invite your attention to these changed conditions, pursuant to Article 4 of the Construction Contract, and in accordance therewith to respectfully request that suitable provision be now made to cover the necessary increased cost of doing the work resulting from these conditions, and for these reasons also to extend our time of performance.
This notice was acknowledged by the Contracting Officer on January 2, 1943, in a letter which stated that the Construction Engineer had been asked by the Contracting Offi *174 cer to make a report on the subject. Although an investigation by the Construction Engineer and his assistant was conducted, no findings of fact or formal report were made as to whether a changed condition existed at that time.
At one point during the early stages of construction the Consulting Engineer expressed the opinion that the bad underground condition encountered by the Contractor might clear up as the sewer line work moved forward but these bad conditions did not clear up and the contractor found it necessary to continue to work in underground conditions, complicated by excessive water.
13. After familiarizing itself with the water condition on the site, plaintiff, on November 27, 1942, three days after commencing work on the open trench portion of this project, and approximately four months before commencing work on the tunnel, placed an order with the Truscon Steel Company of Cleveland, Ohio, for 6,750 steel liner plates of 36-inch radius and 1,985 steel plates of '27-inch radius which it expressly stated were for the project “Patapsco Intercepting Sewers through Bethlehem Steel Company-Fairfield, Ship-' yards in Curtis Bay, Baltimore, Maryland, ‘Square Project No. WPW Project Md. 18-135.’ ” That amount was almost enough to do the entire tunnel portion of this job.
The steel liner plates, for which plaintiff here makes claim, were not, however, finally brought to the job or used until defendant certified to the War Production Board that they were needed on account of the exceptionally bad ground and water conditions encountered. Following such certification a higher priority rating was issued and the steel liner plates were delivered to the job and used for that purpose by plaintiff.
. 14. On December 5, 1942, plaintiff submitted a sketch illustrating its proposed use of steel liner plates in the tunnel portions to the Consulting Engineer and requested approval thereof. In its letter of transmittal plaintiff stated:
We are submitting this method for your approval, due to additional information secured at this-time on ground conditions of the strata through which the tunnel is to be driven. It is now our opinion that this strata will be mostly wet, therefore our original method *175 of using timber supports much be changed for the following reasons:
* * * For safety, of course, the use of liner plates is almost imperative. It is probable that this tunnel will be driven with the aid of the pneumatic process. Under those conditions it would not be practical to concrete the arch portion of the structure as we progress, for if we did little space would be left for transporting excavated material from heading to shaft. As you are aware, this method of supporting the ground is a common accepted practice throughout the United States, in large and small tunnels driven in wet soil.
A copy of this request was forwarded to the Contracting Officer.
By letter dated December 29, 1942, the Consulting Engineer notified plaintiff that it would recommend approval of plaintiff’s proposed method, with the understanding that there would be no addition to or deduction from the contract price. Colonel Henry Perring, senior member of the Consulting Engineering firm, said:
With further reference to your letter of December 5, 1942, relative to the proposal to use steel liner plates throughout the tunnel and to change the tunnel section from that shown on the drawings to a round section to fit the liner plates.
We have submitted this type of construction to the Baltimore and Ohio Railroad Company and they approve this use for under their tracks. They do, however, say “if for any reason the liner plates could not be procured we will insist on the tunnel lining as shown on our Engineer of Bridges’ Drawing #20466.”
You have been advised of this fact previously, verbally, by me, and I also told you that I would recommend this method as a change order it being of course understood that there will be no addition to, or deduction from, the contract price.
* * * * *
In order to have some starting place on this question of liner plates you may proceed with the understanding that the necessary change order will be issued for the following reasons.
(a) The use of liner plates will assure a more stable tunnel support than can be secured under other circumstances.
*176 .(b) If any considerable quantity of water is encountered in the tunnel, the use of liner plates will permit the control of water to a better extent than if timber is used for the lining.
(c) Our estimate of cost indicates that the use of liner plates, with the changed section of the sewer will be somewhat more expensive to you, than the wood lining with the section as shown in the contract drawings, but we understand from you that the additional cost will be well justified to you by reason of the other good points of the liner plates as previously enumerated.
On December SO, 1942, the Contracting Officer wrote to plaintiff and said:
(1) Your desire to change from the use of wood lining in the tunnel to steel liner plates, which plates you assured Mr. Shriner you had located at the plant of the Truscon Steel Company and at the Commercial Stamping Company, and which you further advised could be purchased by merely obtaining a release for this material from the War Production Board, as the above companies did not desire to replace these plates, it is agreeable to this office for you to substitute the steel liner plates for the wooden lining. In substituting the steel liner plates for wooden lining, it is our understanding that there will be no change in your contract price.
Plaintiff secured and used the steel liner plates without manifesting any intention that it expected to be paid for the additional expense thus incurred. It was unable to secure the plates from Truscon until March 31, 1948. This delay was caused by the inability of the plaintiff and defendant to obtain a high enough priority rating from the War Production Board before that time.
15. At the following stations along the sewer line, plaintiff installed full circles of these steel liner plates:
Sta. 0+15.5 to 3 + 69
Sta. 32+55 to 40+55
Sta. 44+37 to 45 + 60
Sta. 46+90 to 48+54.80
At the following stations it installed metal half circles:
10+34 to 11+65
31+05 to 31+57
31+57 to 32+55
40+55 to 41+32
*177 ■ 16. The plates were so designed that they could be bolted together to form a complete circle of steel within which a sewer could be built almost totally free from the dangers and inconveniences of slides and cave-ins. Among the other advantages which accompany the use of metal liner plates are the following:
A. The quantity of earth to be excavated is kept at a minimum. _ The plates are installed in such a manner as to permit excavation approximating the size of the tunnel desired. By excavating only slightly more than the finished size of the tunnel, waste of concrete needed to fill the space between the sewer and the circumference of the tunnel is minimized.
B. The amount of bracing needed to support the tunnel is greatly reduced, thereby leaving the tunnel passageway relatively clear.
C. The quantity of water which is kept out of the tunnel is much greater than where timber lining is employed.
When bolted together six of the metal plates used by the plaintiff formed a continuous steel circle of about 72 inches in diameter.
17. Plaintiff’s tunnel laborers who installed these metal liner plates would usually excavate enough to insert and bolt in place one liner plate at a time. However, where the looseness or wetness of the soil prevented such excavation and installation, they would temporarily insert smaller pieces of wood or timber for the purpose of holding the earth until enough had been removed to permit the liner plate to be bolted in place. The same group of laborers which installed timber lining installed metal liner plates and for the same hourly wage rate.
18. During the week ending March 20,1943, plaintiff commenced tunnel excavation at about station 31+05. On March 29,1943, plaintiff notified the Contracting Officer in writing:
*****
We have now started operations in the tunnel section of this project and we have encountered an underground condition which will not permit the excavation and construction of this sewer in tunnel in free air.
*178 We are making arrangements to install a compressed air plant so that this tunnel will be driven by the pneumatic process, the only way we know to construct it safely.
Since the cost will be increased so much, and compensation for it expected, I believe this will be the proper time to negotiate any additional compensation that we may be entitled to.
By letter dated March 30, 1943, the Consulting Engineer notified the Contracting Officer as follows:
Because of the bad condition at the easterly portal of the tunnel we moved this portal 110' easterly which gave an opportunity to get the portal in good ground and get the start of the tunnel in good ground. The tunnel has proceeded for a distance of about 93' or to Station 32+53 when bad conditions were encountered in the bottom and part way up on the side, causing boiling due to the water and the fine character of the sand and some clay.
As a result of examination the Contractor asked what we were going to do about it and I responded by asking “What are you going to do about it?” He has now decided that he is going to use air, which seems to be a very sensible thing with the type of material he has encountered.
I do not believe that this situation will extend throughout the job and in fact am inclined to think that as soon as he gets under the railroad tracks at about Station 33+20 he will run into better material. This of course is more-or-less conjecture, but in any event has no bearing on his letter to you of March 29, asking for consideration of increased compensation because of using air.
Our Specifications for “Excavation”, Paragraph #1, provides for all materials to be excavated, whether dry or wet, and regardless of the character of the materials. Paragraph 2-b provides “All methods of tunnelling, including the use of metal lining or other supporting methods, will be satisfactory subject to approval, but shall be changed from time to time at the cost of the Contractor, if the conditions so require and he is so directed.” It would seem that the only basis for a claim for additional compensation would be “Changed Conditions” as provided for under Article 4 of the Construetion Contract.
Our general feeling is that there are no subsurface or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifi *179 cations, or unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications. .
The use of air is more expensive in immediate first cost, but this cost would be more than offset in the cost of labor and the rapidity of construction as against attempting to proceed without air .
The policy in various municipalities throughout the country varies in determining whether or not a Contractor should be compensated for additional cost if he finds it necessary to use air. The policy in Baltimore has been to place the responsibility for the methods squarely up to the Contractor and his bid price includes whatever methods may be necessary.
I know of two (2) cases in the City of Baltimore under very similar specifications in which this same Contractor has gone to the use of air without even undertaking to make any claim so that he is familiar not only with the specifications but with policies which have been determined in this locality. I am quite sure that the use of air will pay for itself in increased production and would recommend that no increased compensation be awarded the Contractor because of his desire now to proceed under this method.
By letter dated April 2, 1943, the Assistant to the Contracting Officer notified the plaintiff as follows:
,■ * * * * *
The subject of additional compensation for the installation of a compressed air plant is now being given consideration by the consulting engineers and our construction engineer on this project, and as soon as we receive their report you will be advised further the action taken by this office.
19. From station 32+50 to 40 +40, a distance of 790 feet, plaintiff found it necessary to use compressed air to keep the subsurface water out of the tunnel. This required the building of a brick air lock which plaintiff accomplished during the week ending March 27,1943. In addition, plaintiff there found it necessary to prevent the air from escaping through joints in the brick work and joints in the metal liner plates by “grouting” or filling such spaces with a kind of cement called “grout”.
*180 20. Although the work under this contract was scheduled to be completed within 120 calendar days of November 16, 1942, plaintiff requested extensions of time totalling an additional 287 days. Plaintiff’s stated reasons why it should be granted this additional time were as follows:
1. Ground conditions much worse than anticipated, with excessive amount of water.
2. Severe weather conditions from the beginning of our contract to date.
3. Due to change in soil conditions it was necesary to secure steel liner plates for tunnel shoring, with considerable delay in receiving same.
4. Scarcity of skilled labor so that work could not progress in as many locations as anticipated.
On December 14, 1943, the Contracting Officer approved change order No. 2 which extended plaintiff’s time for completion from March 15, 1943, to November 20, 1943, or 250 calendar days, without any change in contract price, and without withholding any liquidated damages. Plaintiff accepted this change order on November 24,1943.
21. Upon final inspection by representatives of the FWA, the Consulting Engineer and the plaintiff, the contract work was found complete in accordance with plans, specifications and authorized changes. The plaintiff was accordingly informed on December 3, 1943, that it was accepted by the Regional Director, FWA, as of November 21, 1943.
22. On November 12,1943, plaintiff wrote to the Contracting Officer, referred specifically to Article 4 of the contract and submitted various bills for what plaintiff claimed were additional costs, due to “unusual subsurface conditions” encountered in constructing the sewer in the open trench and in the tunnel. Plaintiff attached to this letter as Exhibit “A” a statement of additional costs allegedly incurred due to installation and operation of well points, in the amount of $21,340.46, for which sum it requested a formal change order. It also attached as Exhibit “B” a statement of additional costs allegedly incurred due to the necessity of using steel liner plates instead of timber supports throughout the tunnel, and using compressed air for approximately 900 feet, for *181 both of which it requested another formal change order in the total amount of $18,877.09.
23. On January 29,1944, Col. Perring wrote the following letter to the Contracting Officer:
The Square Construction Company have requested additional compensation of $40,217.55 because of latent conditions being different from those reasonably to be expected.
Mr. Clark of our office, Resident Engineer on this sewer work, and Mr. Booth, Construction Engineer of the Federal Works Agency, have made a careful study of the items composing this bill. The effort was to give all fair and equitable consideration to both the contractor and the Government.
They both recommend there were conditions encountered not in accord with the usual expectations in sewer construction and not as developed in our own test bor-ings. From station 0+00 to station 9+40, an excessive amount of water was encountered, requiring a well point system. From station 32+50 to station 40+40 the water encountered, rising to about the spring line of the arch, required the use of compressed air and also grouting to retain this air.
They recommend for payment items to total $24,145.09, which they feel is fair and properly backed as follows:—
CONTRACTOR’S EXHIBIT “A”
Rental and freight well points_ $6,381.45
Expense of factory representatives_ 1,297.92
Installation and operation of well points_ 1,717.98
Cost of maintenance and pumping of well point system- 3,000.00
Additional sheeting not allowed.
32,397.35
Overhead, profit, etc. — 6%_ 743.84
Total-$13,141.19
Cost of pumping by well points $4,961.56 was analyzed and it appears that a portion of this charge would have been required in any event so that $1,961.56 was deducted from the total, allowing $3,000.00 as excess pumping.
Cost of additional sheeting $6,120.00 was not allowed. First, any and all methods of sheeting were contractor’s choice; second, such saving of cost in sheeting would have an off-set of additional cost of excavation and operation probably as great.
*182 CONTRACTORS EXHIBIT “b”
Rental of air plant_ $1.800.00
Installation of air plant- 600. 00
Demolition of air plant_ 600.00
Construction of air lock- 2,690.26
Operation of air unit- 2, 706. 50
Grouting_ 1,984.28
Cost of steel liner plates in excess of timber not allowed.
10, 381.04
Overhead, profit, etc. — 6% _ 622. 86
Total_$11, 003.90
The use of steel, or other sheeting in tunnel construction is again the contractor’s choice; we do not show in plans or in specifications any particular material.
Their total recommendations are $24,145.09.
We recommend this settlement.
The Contractor has conferred with us and expressed a willingness to accept this as full settlement; with the idea of expediting the closing of accounts.
24. In conformity with Col. Perring’s letter of January 29,1944, change order No. 10 was prepared in the amount of $24,145.09. It was accepted for the plaintiff by its managing partner, Mr. Ragonese, on April 11,1944, and approved by Mr. James Booth, the FWA Construction Engineer, that same date.
However, on April 15, 1944, Mr. Booth notified the contracting officer in his report, which accompanied proposed change order No. 10, that he believed that plaintiff should only be paid additional compensation in the amount of $12,881.63 instead of $24,145.09. He arrived at this sum by reducing the amount allowed in the proposed change order for the well point system from $12,590.83 to $10,897.35, and by eliminating all of the allowances therein incident to plaintiff’s use of compressed air, except $1,984.28 for grouting. Enclosed with that report he forwarded three copies of the Consulting Engineer’s letter dated March 30, 1943, to the Contracting Officer wherein Col. Perring had stated, approximately one year before, during the work on the open trench and shortly after the tunnel work had commenced, that it was their general feeling that no extra compensation *183 should be given plaintiff for the reasons set forth therein. (Finding 18.)
25. By May 10, 1944, no change order having been finally approved, a conference attended by Mr. Ragonese on behalf of plaintiff, Col. Perring on behalf of the Consulting Engineers, and Mr. Booth and others on behalf of the Federal Works Agency, was held in the office of the Contracting Officer in Richmond, Virginia, for the purpose of discussing plaintiff’s claim. In the absence of the Contracting Officer the meeting was presided over by his assistant, Mr. William F. Barrett, Federal Works Agency Assistant Regional Director.
Mr. Ragonese stated that because the graphic cross sections of the two earth auger borings shown on sheet 6 of the contract drawings indicated that they were wet or moist, and because there were no similar indications in the graphic cross sections of the other 16 borings, he reasoned that the 16 must be dry holes. He also reported that he had previously built a sewer at Wagner’s Point about 2,000 feet from this site and encountered only a small amount of subsurface water. Accordingly, he reasoned that he would not encounter any substantial amount of water on the Curtis Bay job.
Each item of plaintiff’s claim as submitted on November 12,1943, was discussed with Mr. Ragonese. The conference lasted approximately four hours.
26. By letter dated August 9,1944, the Contracting Officer notified plaintiff that its claim had been carefully and honestly checked, but that no allowance could be made in the way of extra compensation for the alleged elements of unusual costs encountered in the performance of the contract. The Contracting Officer said:
;[< sj: ifc if:
Considering first the claim made for compensation for use of well points to dewater the open cut, the following conditions must be pointed out:
(a) The test borings shown on the plans in no way indicated a presence or an absence of water. Lack of information as to water level on the logs of the borings could not be interpreted to mean that no water was to be encountered.
*184 (b) The print carried a note to this effect: Information on this sheet regarding existing subsurface earth conditions, as indicated by test borings, is shown for the convenience of the contract [or] only, and the accuracy of this information as shown hereon is in no wise guaranteed.
(c) The specifications under heading “Special Provisions”, paragraph A, first page, carries a statement with a like import. It is quoted here for your convenience:
Note. — Subsurface soil data is shown on the drawings and represents the best information available. The Government assumes no responsibility as to their accuracy or comprehensiveness. Samples of the boring material may be seen at the office of the architect-engineer, Perring and Remington, 10 West Chase Street, Baltimore, Maryland.
Your contention for extra compensation based on the test borings cannot, therefore, be allowed. Your reference to Article 4 of the Contract entitled “Changed Conditions”, as to sub-surface and/or latent conditions materially differing from those shown on the plans or indicated in the specifications, is not fertinent.
The claim for extra length sheathing is closely related to the matter of the well points. No consideration for this item can be allowed for the reasons just stated.
The claim for use of air pressure in the tunnel section cannot be allowed. The specifications are clear in this respect. See paragraph 2-b, Excavation — “All methods of tunneling including the use of metal lining or other supporting methods will be satisfactory, subject to approval, but shall be changed from time to time at the cost of the contractor, if the conditions so require and he is so directed”.
Your request to negotiate appropriate unit prices to cover such work was referred to the Consulting Engineers, who, after immediate study of the matter recommended that no extra payment would be justified. We see no reason at this time to change this attitude. The terms of the contract are quite specific on this point.
The matter of extra payment for substitution of steel liner plates for timber lining of the tunnel section is disallowed. The matter of making this change was brought to the attention of the engineer before taking any action. You were informed, in advance of any tunnel operation that the proposal was satisfactory, but that no extra compensation would be allowed. Your firm elected to accept that ruling and proceeded to acquire the steel liner plates. [Italics added.]
*185 27. By letter dated August 15, 1944, plaintiff acknowledged receipt of the Contracting Officer’s letter of August 9, 1944. In protesting the Contracting Officer’s rejection of plaintiff’s claim it stated that the denial of its claim was contrary to defendant’s assurances that it would be paid for these extra costs and that evidently defendant agreed that the amount claimed was reasonable, but was denying the claim as a matter of law. Plaintiff also stated in this letter that defendant had misrepresented the subsurface soil conditions on the drawings in that defendant had water level information indicating a subsurface water condition which was not reflected on the drawings notwithstanding the fact that a clause in the specifications provided that: “Subsoil data is. shown on the drawings and represents the best information available.”
28. By letter dated September 6,1944, Mr. Barrett, acting for the Contracting Officer, wrote to plaintiff and said:
* * * We have been unable to find any evidence of misrepresentation by the Government of subsoil conditions as alleged in your previous correspondence and would be pleased to confer with you here for the purpose of granting you every opportunity to substantiate your statements.
It is indeed possible that we may not be in possession of all the facts in spite of all our efforts to learn same and it may be that evidence in your possession would tend to revise our opinion.
29. On September 14, 1944, a second conference, presided over by Mr. C. L. Vickers, Contracting Officer, was held in Mr. Vicker’s office. In attendance were Mr. Patz and Mr. Eagonese on behalf of plaintiff; Col. Perring on behalf of the Consulting Engineers; and Mr. Barrett, Mr. Booth and others on behalf of the Federal Works Agency.
At the conference plaintiff produced a copy of the Summary Boring Report prepared by Raymond Concrete Pile Co., Gow Division, dated October 31,1942. The duplicate of that report had been delivered to Perring & Remington, prior to their completion of the contract drawings. A copy is in evidence in this case as plaintiff’s Exhibit No. 2.
*186 In addition to illustrating the nature of the soil found in the 16 Gow boring holes, that report contained the following water level information:
A. In boring No. 1 a water level was reported at 9 feet below ground surface on completion.
B. In boring No. 3 a water level was reported at 10 feet below ground surface 12 hours after completion.
C. In boring No. 7 a water level was reported at 7 feet 3 inches below ground surface 24 hours after completion.
D. In boring No. 15 a water level was reported at 19 feet below ground surface on completion.
E. In boring No. 16 a water level was reported 12 feet 6 inches below ground surface on completion.
In addition, a sixth boring hole, No. 13, was shown by the daily log sheets to have a water level 20 feet 10 inches below ground surface five hours after completion.
Although Col. Perring was familiar with Baymond’s Summary Boring Eeport which was presented on behalf of the plaintiff, no one else then present had ever seen or heard of it other than plaintiff.
Defendant admits that the water level information that it obtained from Eaymond was intentionally not given to bidders.
At the time of the previous conference on May 10, 1944* Mr. Eagonese had not contended that defendant had been guilty of any misrepresentation or withholding of vital information. His contention had been that in relation to the subsurface information given on sheet 6 of the contract drawings, the quantity of subsurface water plaintiff encountered during the course of construction constituted a “changed condition” within Article IV of the contract.
30. On September 18, 1944, the contracting officer wrote the following letter to plaintiff’s attorney:
Since the conference held here with you and your client on September 14, we have given very careful consideration to the claim of the Square Construction Company for additional compensation in connection with the above-identified project.
We regret to inform you that under the facts and law as applicable to the contract of the Square Construction Company, we are obliged to deny the claim.
*187 31. Plaintiff by letter dated September 30,1944, appealed to the head of the department, pointing out that although it did not believe the contracting officer’s decision had involved a question of fact, as a matter of precaution an appeal was being made. In this letter plaintiff also requested a hearing.
32. Following the denial of plaintiff’s claim and the filing of an appeal, and while such appeal was pending, there was a reorganization of the Federal Works Agency, by which the Bureau of Community Facilities was established.
33. On February 9, 1945, Mr. George H. Field, Commissioner of the Bureau of Community Facilities, as representative of the Head of the Department, wrote to plaintiff’s attorney, in part, as follows:
As Commissioner of the Bureau of Community Facilities I have been authorized to act for the Administrator in connection with appeals of the character submitted by you. I have carefully considered all aspects of the claims of your client and have examined the record and other evidence pertaining to this particular contract; I have availed myself of the expert opinions of my associates and have otherwise given these claims and appeal careful and thorough consideration.
In the light thereof and of the facts and circumstances I am of the opinion that the determinations of Mr. C. L. Vickers, former Regional Director of Region No. 2 of the Federal Works Agency, are correct and that his decision denying the claims of the Square Construction Company is proper. I therefore am constrained to concur in such decision.
34. By letter dated February 10, 1945, plaintiff’s attorney acknowledged receipt of Mr. Field’s letter of the previous day. He protested the procedure of Mr. Field in not allowing plaintiff an opportunity to attend a hearing and present facts for consideration before the decision was rendered. He also stated that now the case would be presented to the Court of Claims without any determination of facts.
35. On February 21,1945, Mr. Field wrote the following letter to plaintiff’s attorney:
This is in reply to your letter of February 10 pertaining to the above-captioned project. Contrary to your contention that your appeal from the determination of *188 the Regional Director was not duly considered, all the available data pertaining to such appeal were carefully reviewed and considered prior to my concurrence in the decision of the field office. In reviewing the decision of the field office we naturally assumed that you and the contractor had presented to the Government the evidence and the legal arguments supporting your claim for additional compensation. Communications which you addressed to the Government clearly presented the basis of the contractor’s claim. Our field office was instructed to transmit to us, and did transmit to us, copies of the correspondence pertaining to this particular claim. We carefully and sympathetically considered the data and the arguments which you and your client presented in support of the claim, the determinations made in the field office, the relevant documents and the applicable law. Upon the basis of this careful review we concluded that the contractor’s claim should be denied.
If you, however, desire a hearing and an opportunity to present additional evidence, we shall be only too glad to make arrangements for such hearing. Please advise us when it may be convenient for you to attend a hearing here and we shall then fix a mutually satisfactory time for the hearing.
36. By letter dated February 28, 1945, plaintiff’s attorney acknowledged receipt of Mr. Field’s letter of February 21, 1945. This letter referred to a telephone conversation with Mr. Field in which plaintiff was advised that the matter had been referred to Mr. Field’s assistant. Plaintiff stated in this letter that the Agency had approached the matter with immovable conclusions and doubted whether a belated hearing, after the final decision had been rendered, would be productive, but requested a conference in order to ascertain what Mr. Field had examined or considered in arriving at his decision. Nothing more was heard from Mr. Field by plaintiff and no hearing was ever held.
37. The contracting officer’s decision and its affirmation by the head of the department were based substantially, if not entirely, upon legal grounds. Under their interpretation of the contract plaintiff was required under various provisions of the contract to handle at its own expense all the water that may be encountered, regardless of amount. The plaintiff was never furnished any findings of fact, if any were ever made, that it had not encountered subsurface and/or latent *189 conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications.
38. On October 12,1942, the Consulting Engineers had entered into a standard contract with the Raymond Concrete Pile Company, Gow Division, whereby Raymond agreed to make 16 Gow Test Borings along the proposed sewer line, and furnish not only the composition of subsurface soil, but also water level data if water were encountered. Prior to this time the Consulting Engineers had endeavored to make two borings with an earth auger in the swamp area of the proposed line, at Stations 14+80 and 17+20. However, because of the wetness of the ground the holes caved in when water was struck, necessitating the employment of Raymond who had equipment for casing the holes. The drawings furnished to the bidders made no reference in the subsurface soil data shown thereon to the water thus encountered by the Consulting Engineers of FWA.
39. In making Gow Test Borings a metal casing is first driven into the ground by a slip weight. Then water is forced into the casing, washing the soil in the casing up and out. Such borings differ from ordinary wash borings in that after the hole is thus washed out a sample of the soil in the hole is taken with a split spoon. When taken this soil sample is relatively dry. Where possible, water levels are measured after the casings are withdrawn from the hole, givirig the water which has been forced in an opportunity to disperse, and giving the ground water an opportunity to seek its own level in the hole. The longer one waits after the casing is withdrawn before measuring the water level, the more accurate and reliable the measurement will be. However, in loose, porous, granular soil, it is sometimes impossible, once the casing is removed, to keep the hole open long enough to measure the water level.
40. In order to enable the Consulting Engineers to proceed expeditiously with the drawing up of the plans and specifications, Raymond furnished boring reports almost daily *190 from October 15, 1942, through October 29, 1942. Those daily logs indicated that the soil was composed of considerable sand with various clay strata, some gravel, but no rock. Each of these daily logs were prepared in triplicate with one of the carbon copies being delivered to the Consulting Engineer. On six of the daily logs delivered to the Consulting Engineers subsurface water levels were shown. These were at holes 1, 3,7, 13,15 and 16. On the other 10 logs no water levels were shown. On completion of all 16 borings, Raymond’s Summary Boring Report, which was dated October 31, 1942, was received in the Consulting Engineers’ office on November 5,1942. This report gave subsurface water levels in 5 holes, as previously set forth in Finding 29. The only boring where a water level measurement was recorded on the foreman’s daily log but not on the Summary Boring Report was No. 13, at Station 44+95, where 5 hours after completion of the boring a water level was recorded at 20' 10" below ground surface.
41. The evidence establishes that although Raymond recorded measuring water levels in 6 of the 16 Gow boring holes, it actually encountered subsurface water in many of the other 10 holes. However, it made no record of having encountered water in these other1 holes. This omission was in keeping with Raymond’s practice not to record a water level unless it could be done with reasonable accuracy. Raymond’s failure to record the water levels in the other holes where it was encountered was not due to any fault or negligence on Raymond’s part but rather to the fact that in removing the casings from the holes preparatory to measuring water levels they closed or caved in before the water level measurement could be taken.
The evidence shows that in performing this contract plaintiff encountered subsurface water not only at or about the location of 5 of the 6 borings where Raymond recorded measuring water levels, but also at or about the location of 8 of the 10 other Gow boring holes where Raymond had been unable to measure the level of the subsurface water.
42. The Consulting Engineers, who prepared the plans and specifications, completely and accurately transposed graphically the soil cross-sections from Raymond’s boring *191 reports to sheet 6 of the contract drawings which were subsequently submitted to all bidders, but they purposely omitted all of the subsurface water level data furnished.
43. In addition to the plaintiff, the following construction contractors, also experienced in sewer and tunnel work, though not as familiar with conditions in the immediate Curtis Bay area as was the plaintiff, prepared and submitted the only other bids received on this job:
A. Leo Butler Co., Silver Spring, Md., $324,891.70.
B. John Matricciani, Baltimore, Md., $448,360.72.
C. Kaufman Construction Co., Inc., Philadelphia, Pa., $459,680.00.
At the trial defendant produced the representatives of those companies who had prepared or assisted in the preparation of the bids on this job. Each company had received the same plans and specifications which were given to plaintiff. Prior to preparing and submitting their bids none of them were informed of the water levels Raymond had recorded. Each was afforded an equal opportunity to examine the site and the boring samples. Each sent a representative to the site.
They testified that when they prepared their bids they made cost allowances for the expenses they expected to incur as a result of encountering a large quantity of subsurface water.
Mr. Leo Butler, who was the only bidder that retained any written records pertaining to the bids, allowed over $50,000 for handling subsurface water.
Two bidders planned to use well points and one planned to use ordinary pumps in the open trench portion. Two bidders planned to use metal liners and one planned to use timber liners in the tunnel. Two bidders planned to use compressed air and one planned to use free air in the tunnel. The highest bidder had not planned to use well points in the open trench or compressed air in the tunnel.
The following factors were most frequently mentioned by them as indicating the presence of subsurface water: (A) the proximity of the open body of water, known as Stone-house Cove, to the line of construction; (B) the sandy nature *192 of the soil; (C) the invert of the sewer being below sea level for approximately 4,800 of the sewer’s 5,400 feet.
44. Certain established facts, hereinafter recited, furnish reasonable grounds at the time the bids were prepared and submitted for plaintiff to have expected that it would not encounter large amounts of subsurface water during construction : ■ ■
(A) Plaintiff had had more experience in performing such work in the immediate vicinity than had any of the other bidders. Plaintiff had recently completed a 2,500-foot sewer in tunnel for the City of Baltimore, about % mile further south at a place known as Wagner’s Point. It had taken over the Wagner’s Point job after another sewer contractor had failed to make satisfactory progress. Metal liner plates were used throughout the Wagner’s Point job, which was entirely in tunnel, since these plates were already on the job site, having been ordered previously by the contractor whose work had been taken over by plaintiff. Out of the 2,500-foot sewer plaintiff found it necessary to use compressed air because of subsurface water for about 800 feet. The location of the site of the Wagner’s Point job was a little further from the open water (Stonehouse Cove) than was the site location of the Curtis Bay Intercepting Sewer. At the time Square Construction Company prepared and submitted its bid on the Curtis Bay Intercepting Sewer job, it had completed the Wagner’s-Point job. Plaintiff was aware of the fact that in the construction of two other nearby sewers very little subsurface water had been encountered by the contractors.
(B) Mr. Bagonese was on the site of this job prior to the preparation of plaintiff’s bid and traversed almost the entire distance to be covered in laying the sewer. The plaintiff neither had the time nor the equipment to make adequate boring tests.
(C) Accompanying its bid plaintiff submitted as a list of its major equipment the following:
5 Northwest Cranes & Pull Shovels
2 Tractor Bulldozers — Large quantity of pumps 4 Trucks
Complete tunnel construction plant (including low pressure compressors and air-locks)
*193 All of the above listed equipment was used by plaintiff on the job.
(D) The day plaintiff was to commence construction in the open trench portion of the job, it had ready on the site two 6-inch and one 4-inch centrifugal pumps.
(E) Plaintiff was aware of the fact that the Eaymond Concrete Pile Company was a reputable firm which furnished water level information if water was encountered and that this firm had recently made the test borings shown on sheet 6 of the drawings and that this sheet contained no water level information on the borings made by it.
45. The evidence indicates that plaintiff’s partner, Eago-nese, was desirous of obtaining the contract for construction of the sewer involved in this case. He was not listed with the group of contractors to whom the defendant originally planned to send invitations to bid. Upon learning that the work was to be performed, he requested that he be given an opportunity to bid. He was given such opportunity and, after preparing his bid, he personally took the bid to Eich-mond and was present when the bids were opened. The evidence shows that plaintiff did not include in his bid any allowance for the following:
1. Installation of well points.
2. Maintenance and operation of a well point system.
3. Installation and operation of an air plant.
4. Cost of an air lock.
5. Grouting ahead of the driving of the tunnel.
6. Steel liner plates.
46. Examination of the site of proposed work, in the absence of subsurface data, presents no reliable guide to bidders in determining whether or not underground water will be encountered, even though the location may be close to a surface body of water. Contractors have failed to encounter water where expected and where work was adjacent to a surface body of water, and have encountered underground water when there was no surface body of water nearby. These occurrences are attributed to the fact that clay strata forms an impervious wall retaining and diverting water from its expected course.
*194 47. The evidence shows that bidders and contractors desire all the subsurface information that is available and that they definitely rely on the subsurface data as represented on the plans and specifications as a guide in formulating their bids.
48. The evidence establishes that the decision of FWA’s Consulting Engineers to omit from the contract drawings any mention of the subsurface water levels recorded by Raymond, a reputable firm which furnishes water level information if water is encountered, and also the omission of its own water findings at two other points along the proposed sewer line, in view of the representation included in the “Special Provisions” of this contract (see finding 6), was a withholding of vital information from the bidders. The subsurface soil data shown on the drawings furnished the bidders did not represent the best information available.
49. The evidence establishes that plaintiff encountered subsurface conditions materially differing from what he expected to find. The evidence also establishes (finding 23) that FWA’s Construction Engineer, its Consulting Engineer, and the Consulting Engineer’s Resident Engineer had investigated the conditions and the extra cost thus incurred and found “conditions encountered not in accord with the usual expectations in sewer construction and not as developed in our test borings,” and that excessive water had been encountered on about 1,700 feet of the job.
50. The extra costs that plaintiff incurred because of the subsurface water condition which is clearly established by the evidence is $24,145.09, for the items set forth in finding 23.
51. The evidence fails to show that plaintiff’s costs for additional sheeting was an extra cost. This is because the plaintiff’s use of the additional sheeting was offset by the expense saved in excavation and operating expense.
52. Defendant concedes that plaintiff is due $2,634.62 aside from the claim here in question. On June 4, 1946, plaintiff was notified by defendant as follows:
The balance due you on previously approved work is $2,634.62 and will be paid promptly upon the submission of a properly prepared final estimate, forms for which are enclosed.
*195 Plaintiff has not submitted the appropriate forms but in Paragraph XIII of the petition this amount is claimed.
53. The Square Construction Company, a co-partnership, is well qualified, competent, and capable to perform the type of sewer construction work involved in this action and did perform the work required by the contract entered into between plaintiff and defendant in a satisfactory and capable manner.
CONCLUSION 03? LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiffs are entitled to recover, and it is, therefore, adjudged and ordered that they recover of and from the United States the sum of twenty-six thousand seven hundred seventy-nine dollars and seventy-one cents ($26,779.71).

 The caving 5n of the 11 holes where the water level was not given would (have warned plaintiff of the probable presence of water, although this would mot necessarily be so.

 This is doubtful because neither the contracting officer nor the head of the department made findings of fact thereon.

 The basic statutory authority for this Federal Works Agency project is Public Law 849, 76th Congress, as amended by Public Law 137, 77th Congress (June 28, 1941), known as the Lanham Act. As amended, the Act provided In pertinent part of Title II, Section 202 (b)- “Whenever the President finds that in any area or locality an acute shortage of public works * * * exists ■or impends which would impede National defense activities * * * the Federal Works Administrator is authorized : •* * * (b) By contract or otherwise * * * to plan, design, construct, remodel, extend, repair or lease public works * * * and do all things in connection therewith to carry out the purpose of the title’ ”.