**MORRISON–KNUDSEN COMPANY, Inc.**

v.

**The UNITED STATES.**

No. 229–60.

United States Court of Claims.

Decided May 14, 1965.

Donald McL. Davidson, Seattle, Wash., for plaintiff. W. H. Ferguson and Ferguson & Burdell, Seattle, Wash., were on the brief.

Edwin J. Reis, Washington, D. C., with whom was Asst. Atty. Gen., John W. Douglas, for defendant.

Before LARAMORE, Acting Chief Judge, DURFEE, DAVIS and COLLINS, Judges, and WHITAKER, Senior Judge.

PER CURIAM:

Under the order of reference and the order of the court dated April 12, 1963, this case was referred to Trial Commissioner Mastin G. White with directions to make findings of fact and recommendation for a conclusion of law. The commissioner has done so in an opinion and report filed on April 2, 1964. Exceptions to the commissioner's report and briefs were filed by the parties and the case was submitted to the court on oral argument of counsel. Since the court is in agreement with the findings, opinion and recommended conclusion of law of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Therefore, plaintiff is entitled to recover and judgment is entered for plaintiff in the sum of $1,609. Plaintiff's motion to strike defendant's brief and for costs is denied.

OPINION OF COMMISSIONER

*Breach of Contract*

The plaintiff was the successful bidder on, and subsequently performed, a large construction contract at the Ladd Air Force Base in Alaska. The contract, involving both unit-price items and fixed-cost items, was entered into between the plaintiff and the defendant on October 14, 1953. It was administered for the defendant by the Corps of Engineers, United States Army.

One of the unit-price items, designated as Item No. 1, related to structural excavation and covered an estimated quantity of 35,500 cubic yards of such excavation. Approximately 30 percent of this structural excavation was to be done at two sites, which are involved in the present action. The excavation at one of these sites was to be done in preparation for the installation of works designated as Increments L-3 and L-4; and the excavation at the other site was for works designated as Increments L-5 and L-6. The two sites were located approximately 1,750 feet apart. The excavation at each site was to be about 25 feet deep, 130 feet long, and 30 feet wide at the widest point.

The plaintiff contends—and the evidence shows—that in connection with the issuance on July 29, 1953, of the invitation for bids on the proposed contract, the defendant made to prospective bidders, including the plaintiff, misrepresentations concerning the subsurface conditions that had been encountered in previously drilling two 30-foot test borings at the respective excavation sites which are involved in the present litigation. The misrepresentations related to

the purported absence of permafrost within the 30-foot depth of each of the two test borings.

The Ladd Air Force Base is located on the flood plain of the Tanana River in the vicinity of Fairbanks, Alaska. The ground in this area, down to a depth of approximately 400 feet from the surface, consists of alluvial or stream-laid deposits in the form of strata that are made up of silt, sand, or gravel, or mixtures of these materials.

Another geographical and geological feature of great significance from the standpoint of the present litigation is that the Ladd Air Force Base is located within the discontinuous permafrost zone. Permafrost is ground that is permanently frozen (i. e., its temperature has been below zero degrees centigrade for 2 years or more). There are three permafrost zones—the continuous permafrost zone, the discontinuous permafrost zone, and the sporadic permafrost zone. In the continuous permafrost zone, permafrost underlies the surface of the ground everywhere; and there is certainty that anyone drilling or excavating below the surface to a substantial depth at any point will encounter permafrost. In the discontinuous permafrost zone, permafrost underlies the surface of the ground at most places but not everywhere; and there is better than a 50 percent probability that anyone drilling or excavating below the surface to a substantial depth at any point, without previous subsurface exploration, will encounter permafrost. In the sporadic permafrost zone, permafrost underlies the surface of the ground in some places but not in most places; and there is less than a 50 percent chance that anyone drilling or excavating below the surface to a substantial depth at any point, without previous subsurface exploration, will encounter permafrost.

Permafrost, when encountered in the vicinity of the Ladd Air Force Base, is sometimes in the form of a stratum and sometimes in the form of a pocket.[1] It is much more difficult and expensive to excavate than the unfrozen alluvial soils of the area.

Permafrost is to be distinguished from seasonal frost, which is ground that is frozen at and somewhat below the surface in the cold-weather months, but does not remain permanently frozen.

In connection with the invitation for bids leading up to the contract that is involved in this case, the defendant furnished to prospective bidders, including the plaintiff, written data in the form of profile drawings and related legends that purported to show the results of 33 test borings that had been accomplished by the defendant for the purpose of ascertaining subsurface conditions at the Ladd Air Force Base. The two test borings with which we are primarily concerned were designated as drill holes 260 and 261.

The written data relative to drill hole 260 furnished by the defendant to the plaintiff and other prospective bidders indicated (among other things) that this hole had been drilled on February 2, 1953; that it had been drilled at a point on the southeastern edge of the prospective excavation limits for L–3 and L–4; that it had gone to a depth of 30 feet from the surface of the ground; and that the ground was unfrozen throughout the 30-foot depth of the hole (i. e., that no seasonal frost or permafrost was encountered).

The written data relative to drill hole 261 furnished by the defendant to prospective bidders indicated (among other things) that this hole had been drilled on February 10, 1953; that it had been located within the limits, and at the east end, of the prospective excavation for L–5 and L–6; that it had gone to a depth of 30 feet; and that the ground was unfrozen throughout the 30-foot depth of the hole.

---

1. The evidence in the record does not establish the average thickness of the strata or pockets of permafrost in the area of the Ladd Air Force Base, or the average depth at which the permafrost is encountered.

The representations by the defendant to prospective bidders that only unfrozen ground had been encountered within the respective 30-foot depths of drill holes 260 and 261 were untrue. Actually, in drilling hole 260, permafrost had been encountered at a depth of 12 feet below the surface of the ground, and the permafrost extended from the 12-foot level down to the bottom of the hole at a depth of 30 feet. Similarly, in drilling hole 261, the defendant had encountered permafrost at a depth of 7 feet below the surface of the ground, and the permafrost had extended down to the bottom of this hole at a depth of 30 feet.[2]

The work of excavating at the site of Increments L–3 and L–4 was begun on June 3, 1954, and such work was begun at the site of Increments L–5 and L–6 on June 5, 1954. Several days later, as the excavation work was in progress, permafrost was encountered at each of the two sites.[3] The permafrost in the excavation for L–5 and L–6 was encountered at an average depth of about 7 feet below the surface of the ground; and, as it was later discovered, the permafrost extended to the bottom of this excavation. The permafrost in the excavation for L–3 and L–4 was encountered at an average depth of about 10 feet below the surface of the ground; and it, too, extended downward to the bottom of the excavation.

When permafrost was first encountered in excavating at the two sites mentioned in the preceding paragraph, an effort was made to cope with the permafrost by using the equipment that was then working in each excavation, i. e., a bulldozer and ripper and a dragline. An attempt was made to rip the permafrost, assemble the broken pieces with a bulldozer, and then remove this material with a dragline. Progress was so slow, however, that it was necessary to shift to the process of blasting the permafrost. Preparations for the blasting were begun on June 10, 1954. This involved the assembling of additional equipment, such as drills, compressors, trucks, and powder magazines, and also additional manpower. The preparations had been completed by June 14, 1954, and blasting was begun on that date. Thereafter, blasting was used exclusively as the means of breaking up the permafrost in the two excavations, until a point some 2 or 3 feet above the bottom of each excavation was reached. The holes for the blasting were drilled in the permafrost to a depth of 5 or 6 feet; and then, after each "shot" in an excavation, a bulldozer and a dragline were moved to the site for the purpose of assembling and removing the pieces of permafrost broken by the blast. Because of the proximity of an aircraft runway to each excavation, the defendant regulated the timing of, and the amount of powder used in, the various "shots," so as to avoid interference with air traffic. This caused delay in connection with the excavation of the permafrost. The last 2 or 3 feet of permafrost in each excavation was ripped loose and then removed, instead of being blasted.

A total of approximately 5,964 cubic yards of permafrost was removed from the two excavations with which we are concerned. The reasonable extra cost of removing the permafrost, over and above the reasonable cost of removing an equivalent quantity of unfrozen ground at the two sites, amounted to ap-

2. The defendant had also encountered seasonal frost in each of the drill holes designated as 260 and 261, and the seasonal frost extended from the surface of the ground down to a depth of 5 feet in each hole. However, there is no complaint in the present action relative to the defendant's misrepresentations concerning the purported absence of seasonal frost.

3. Permafrost was also encountered in excavating at the site for Increment L–1. However, that is not directly involved in the present litigation, as the defendant made an equitable adjustment in the contract price that was satisfactory to the plaintiff with respect to the encountering of permafrost at L–1.

proximately $4.20 per cubic yard, and thus totaled approximately $25,049.

█ The plaintiff, in submitting its bid and in entering into the contract, had a right to rely upon the positive representations that were made by the defendant regarding the subsurface conditions that purportedly had been encountered in drilling holes 260 and 261. Levering & Garrigues Co. v. United States, 73 Ct.Cl. 566, 574 (1932). Such positive representations amounted to a warranty (Atlantic Dredging Co. v. United States, 53 Ct.Cl. 490, 502, aff'd 253 U.S. 1, 40 S.Ct. 423, 64 L.Ed. 735 (1918)), and established a predicate for a possible action for breach of contract when it was later discovered by the plaintiff that the defendant's representations concerning subsurface conditions at the two points were untrue (Ragonese v. United States, 128 Ct.Cl. 156, 163, 120 F.Supp. 768 (1954)). It was not incumbent upon the plaintiff, prior to submitting its bid and entering into the contract, to conduct its own investigation in order to ascertain the truth or falsity of the defendant's positive assertions regarding subsurface conditions encountered in drilling holes 260 and 261, even though the contract contained a general condition stating that "The Contractor further acknowledges that he has satisfied himself as to the character, quality and quantity of surface and sub-surface materials to be encountered insofar as this information is reasonably ascertainable from an inspection of the site, including all exploratory work done by the Government," and also contained a technical provision stating that "the Government does not guarantee that materials other than those disclosed by the explorations [i. e., the test borings] will not be encountered." Hollerbach v. United States, 233 U.S. 165, 172, 34 S.Ct. 553, 58 L.Ed. 898 (1914); Flippin Materials Co. v. United States, 160 Ct.Cl. 357, 365, 312 F.2d 408 (1963). A significant factor in this connection was the circumstance that the physical conditions dealt with in the defendant's untrue representations were hidden in the subsurface, and the plaintiff could not determine the truth or falsity of the representations by mere observation. Atlantic Dredging Co. v. United States, supra, 53 Ct.Cl. at p. 502.

█ Perhaps it should be mentioned that there is no evidence in the record indicating any intention on the part of the defendant to deceive the plaintiff (or any other prospective bidder) in connection with the furnishing of the untrue information regarding the subsurface conditions that were encountered in drilling holes 260 and 261. On the contrary, the evidence warrants the inference that the untrue representations made to the plaintiff (and to other prospective bidders) by the defendant were the result of negligence, rather than bad faith, in connection with the preparation of the bid documents. However, the lack of what the Supreme Court has referred to as a "sinister purpose" is immaterial. Christie v. United States, 237 U.S. 234, 242, 35 S.Ct. 565, 59 L.Ed. 933 (1915).

█ On the other hand, mere proof of the defendant's misrepresentations is not sufficient to justify a judgment in favor of the plaintiff. A further prerequisite to recovery by the plaintiff is proof that the plaintiff was misled by such misrepresentations. Ragonese v. United States, supra, 128 Ct.Cl. at p. 162. The plaintiff's case is weak as to the latter point.

The official of the plaintiff corporation who was in charge of the work of preparing and submitting the plaintiff's bid on the contract did not testify at the trial. Consequently, the record is lacking in direct evidence with respect to the effect upon this official's subjective mental processes of the defendant's misrepresentations concerning the subsurface conditions that were encountered in drilling holes 260 and 261.

When all the pertinent evidence in the record is considered, it seems clear that the plaintiff could not reasonably have been misled by the defendant's misrepresentations concerning drill holes 260

and 261 into believing that *no* permafrost would be encountered in excavating the two sites that are involved in the present litigation. Rather, the situation seems to have been one where the plaintiff was well aware that some permafrost might be encountered in performing the excavation work at the two sites.

In the first place, the plaintiff, when it submitted its bid and entered into the contract, was experienced in the area and had general knowledge of the widespread, though discontinuous, existence of permafrost in the vicinity of the Ladd Air Force Base. Consequently, it is reasonable to infer that the plaintiff was aware of the likelihood that some permafrost would be encountered in any large excavation project of the sort involved here.

In the second place, the contract contained a provision that specifically informed the plaintiff of the likelihood of encountering permafrost. This provision was phrased in the following language:

> "This base is located in an area in which frost-susceptible materials and permafrost are frequently encountered. The area is underlain by a deep alluvium of river deposits in varying strata, the soils being primarily of glacial origin. Subsurface investigations near the site have disclosed that either or both frost-susceptible soils and permafrost may be found beneath the existing surface."

In the third place, the incorrect data which the defendant furnished to the plaintiff with respect to the purported subsurface conditions that had been encountered in drilling holes 260 and 261 represented only a portion of the material which the defendant furnished to the plaintiff (and other prospective bidders) regarding subsurface conditions disclosed as a result of test borings; and it must be concluded that the overall result of such information was to alert the plaintiff to the spotty existence of permafrost in the area. As mentioned earlier in this opinion, the defendant furnished to the plaintiff (and other prospective bidders) written data purporting to show the results of 33 test borings. Such material indicated that slightly more than half of the test borings had been performed at points so distant from the two excavation sites with which we are concerned that they are not material to the issues in the present litigation. However, the data concerning 13 test borings—in addition to drill holes 260 and 261, previously discussed—are pertinent. The defendant's representations concerning these 13 test borings (none of which is alleged to have misled the plaintiff in so far as they purported to show the presence or absence of permafrost) are summarized in paragraphs (c)–(f) and (h)–(p) of finding 6.

The representations concerning the 13 test borings referred to in the preceding paragraph indicated that permafrost had been encountered 10 feet below the surface of the ground at the east end of the site for L–3 and L–4, and slightly to the north of drill hole 260; that permafrost had been encountered 12 feet below the surface of the ground at a point approximately 500 feet southwest of the site for L–3 and L–4; that no permafrost had been encountered in a boring taken to a depth of 16 feet at a point approximately 300 feet southeast of the site for L–3 and L–4; that no permafrost had been encountered in a boring that had gone to a depth of 16 feet at a point approximately 600 feet southeast of the site for L–3 and L–4; that permafrost had been encountered 10 feet below the surface at a point adjacent to, and just northwest of, the site for L–5 and L–6; that permafrost had been encountered 6 feet below the surface at a point about 100 feet south of the site for L–5 and L–6; that no permafrost had been encountered in a boring that had gone to a depth of 16 feet at a point approximately 300 feet southwest of the site for L–5 and L–6; that no permafrost had been encountered in a boring that had gone to a depth of 15

feet at a point approximately 400 feet southeast of the site for L–5 and L–6; that no permafrost had been encountered in a boring that had gone to a depth of 15 feet at a point approximately 600 feet southwest of the site for L–5 and L–6; that permafrost had been encountered about 14 feet below the surface at two different points within the 1,750-foot intervening area between the site for L–3 and L–4 and the site for L–5 and L–6; that permafrost had been encountered about 13½ feet below the surface at a point approximately 750 feet northeast of the site for L–5 and L–6, and approximately 1,000 feet northwest of the site for L–3 and L–4; and that permafrost had been encountered 14 feet below the surface at a point approximately 750 feet southeast of the site for L–5 and L–6, and approximately 1,100 feet southwest of the site for L–3 and L–4. These data furnished by the defendant to the plaintiff in connection with the bid papers were clearly sufficient to indicate to a reasonably prudent bidder that permafrost was widespread in the area of the two excavation sites and might well be encountered in performing the excavation work at the two sites, even though the information which the defendant furnished as to holes 260 and 261 incorrectly showed an absence of permafrost at the particular points where those holes were drilled.

■ In connection with the point discussed in the preceding paragraph, it should be mentioned that data concerning subsurface conditions developed as a result of test borings in the area of the Ladd Air Force Base must be regarded as having limited applicability in so far as they show the presence or absence of permafrost. This is necessarily so because of the discontinuous nature of the permafrost in that area. For example, when permafrost is encountered in a test boring at a certain depth, it can reasonably be presumed that permafrost also exists at the same depth in the ground extending outward in all directions from the boring for a distance of about 10 feet; but such a

discovery cannot be accepted as providing a basis for a reasonable presumption concerning the existence of permafrost at a distance of more than 10 feet from the boring. Similarly, when permafrost is not encountered in a test boring, it can reasonably be presumed that no permafrost exists in the ground extending outward in all directions from the boring for a distance of about 10 feet, and down to whatever depth the boring was taken; but the lack of permafrost at the place of the boring cannot be accepted as the basis for a reasonable presumption regarding the lack of permafrost at a distance of more than 10 feet from the boring. Therefore, the incorrect information which the defendant furnished to the plaintiff concerning the purported lack of permafrost at the places where holes 260 and 261 were drilled could not reasonably be accepted by the plaintiff as indicating the lack of permafrost throughout the large areas of the two excavations that are before the court for consideration.

■■ It appears, therefore, that the plaintiff could reasonably have been misled by the defendant's misrepresentations concerning drill holes 260 and 261 only to the extent that the plaintiff later encountered, and was compelled to excavate, permafrost within a radius of about 10 feet from the points where these holes were erroneously shown by the defendant as having been drilled without encountering permafrost. Thus, the reasonable effect of the defendant's misrepresentations was limited to a total of approximately 383 cubic yards of permafrost; and the plaintiff's damages from the breach of contract based upon such misrepresentations amounted only to approximately $1,609.

*Equitable Adjustment*

Because of encountering permafrost in the two excavations discussed in the first part of this opinion, and also in a third excavation for works designated as Increment L–1, the plaintiff submitted to the administrative agency a claim for an equitable adjustment under the

"Changed Conditions" provision of the contract. That provision stated in part as follows:

"Should the contractor encounter * * * during the progress of the work subsurface and/or latent physical conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown physical conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the drawings and specifications, the contracting officer shall be notified promptly in writing of such conditions before they are disturbed. The contracting officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ the contract shall be modified to provide for any increase * * * of cost * * * resulting from such conditions. If the parties fail to agree upon the adjustment to be made, the dispute shall be determined as provided in Clause 6 hereof."

"Clause 6 hereof" was the provision of the contract dealing with the subject of "Disputes." It stated in part as follows:

"Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing * *. Within 30 days from the receipt thereof, the Contractor may appeal in writing to the Chief of Engineers, whose written decision thereon, or that of his designated representative or representatives, shall be final and conclusive upon the parties hereto unless within 30 days after the receipt thereof by the Contractor, he appeals in writing to the Secretary [of the Army], which

appeal shall operate to vacate said decision of the Chief of Engineers. If the dispute is determined by the Secretary, his written decision, or that of his designated representative or representatives, shall, unless determined by a court of competent jurisdiction to have been fraudulent, arbitrary, capricious or so grossly erroneous as necessarily to imply bad faith, be final and conclusive upon the parties hereto. * * *"

■ In connection with the "Disputes" provision of the contract, it should be noted that, pursuant to the so-called Wunderlich Act (41 U.S.C. § 321 (1958)), an administrative determination on a question of fact made under the standard disputes provision of a Government contract is entitled to finality only if it is supported by substantial evidence, in addition to meeting the standard of a lack of fraud, arbitrariness, capriciousness, and gross error implying bad faith.

The plaintiff's claim for an equitable adjustment was denied by the contracting officer, whereupon the plaintiff took an appeal under the "Disputes" provision of the contract to the Chief of Engineers. The appeal was referred to the Corps of Engineers Claims and Appeals Board as the duly authorized representative of the Chief of Engineers for the handling of such matters. The Board's decision, following a rather lengthy hearing, was favorable to the plaintiff with respect to the encountering of permafrost in the excavation for Increment L–1, but was unfavorable to the plaintiff with respect to the encountering of permafrost in the excavations for Increments L–3 and L–4 and Increments L–5 and L–6.

The plaintiff next appealed to the Secretary of the Army, and the appeal was considered by the Armed Services Board of Contract Appeals as the duly authorized representative of the Secretary. With respect to the portion of the plaintiff's claim relating to L–1, the ASBCA

held for the plaintiff on the basis of the following finding:

" * * * We find the evidence establishes that the contractor encountered permafrost with respect to Increment L–1, which constituted a "changed condition" within the meaning of the pertinent article in the prime contract. * * * The contractor is entitled to an equitable adjustment with respect to the permafrost encountered in excavating for the construction of Increment L–1.[4]

However, the Armed Services Board of Contract Appeals disallowed the portions of the plaintiff's claim relating to the permafrost in the excavations for increments L–3 and L–4 and Increments L–5 and L–6. With respect to the encountering of permafrost in these two excavations, the ASBCA made the following factual determination:

" * * * [T]he boring logs, taken as a whole * * * clearly indicate that the contractor should have expected to encounter permafrost in excavating for the sites for Increments L–3, L–4, L–5, and L–6. * * * From such drawings the Board finds that the contractor should have expected permafrost * * *."

There is nothing in the record to indicate that the factual determination of the Armed Services Board of Contract Appeals to the effect that "the contractor should have expected permafrost" in excavating the sites for Increments L–3 and L–4 and Increments L–5 and L–6 was fraudulent, arbitrary, capricious, or so grossly erroneous as necessarily to imply bad faith; and such factual determination was supported by substantial evidence, both in the record that was before the ASBCA at the time and in the whole record that is before the court. Consequently, in so far as the plaintiff's claim for an equitable adjustment is concerned, the factual determination of the ASBCA is final and conclusive under the "Disputes" provision of the contract and under the related provision of the Wunderlich Act.

It will be noted, though that the factual determination of the Armed Services Board of Contract Appeals was merely that the plaintiff should have expected to encounter *some* permafrost in excavating at the two sites that are involved in the present litigation. The ASBCA did not make—and, in view of the evidence before it, could not properly have made—a factual finding to the effect that the plaintiff should have expected to encounter permafrost in the immediate vicinity of the points where the defendant's drawings incorrectly showed holes 260 and 261 to have been drilled without encountering permafrost. Therefore, even if the ASBCA's factual determination that "the contractor should have expected [some] permafrost" in excavating the sites for Increments L–3 and L–4 and Increments L–5 and L–6 is pertinent to the breach of contract issue discussed in the first part of this opinion, it does not affect the conclusion previously stated that the plaintiff has a cause of action for breach of contract in so far as the plaintiff encountered, and was compelled to excavate, permafrost in the immediate vicinity of the points where holes 260 and 261 were erroneously shown by the defendant as having been drilled without encountering permafrost.

Also, the permafrost near drill holes 260 and 261 certainly came within the category of "subsurface and/or latent physical conditions at the site materially differing from those shown on the draw-

---

4. As a result of subsequent negotiations between the parties, the defendant increased the contract price by $18,208.50 in allowing the plaintiff an equitable adjustment on account of the permafrost that was encountered and removed from the L–1 excavation. This adjustment was evidently satisfactory to the plaintiff, as no complaint is made in the present litigation regarding the permafrost in the L–1 excavation. It appears that approximately 4,333 cubic yards of permafrost was removed from this excavation, out of a total of approximately 6,333 cubic yards of excavated material at L–1.

ings," as this phrase was used in the "Changed Conditions" provision of the contract; and the action of the ASBCA in rejecting the plaintiff's claim under the "Changed Conditions" provision of the contract was erroneous as to this relatively small amount of permafrost. However, the figure of $1,609 previously mentioned as the plaintiff's damages for the breach of contract in this respect would constitute an adequate equitable adjustment under the "Changed Conditions" provision of the contract.[5]

---

5. In connection with the matter of an equitable adjustment, it is of some interest to note that the total excavation performed under Item 1 of the contract amounted to 36,979 cubic yards, and that approximately 10,297 cubic yards of this material consisted of permafrost. Thus, the permafrost that was excavated under Item 1 of the contract comprised approximately 27.85 percent of the total material that was excavated under Item 1. This was probably a higher percentage of permafrost than is ordinarily encountered in a large-scale excavation project within the area of the Ladd Air Force Base, although the evidence on this point is not fully developed in the record. There is some indication in the record

that perhaps the plaintiff should have expected to encounter permafrost to the extent of about 15 percent of the total material excavated under Item 1 of the contract. On that basis, the plaintiff should have expected to encounter approximately 5,547 cubic yards of permafrost in performing the excavation work under Item 1 of the contract, whereas the amount actually encountered was approximately 10,297 cubic yards. However, the plaintiff has already received an equitable adjustment amounting to $18,-208.50 because of encountering permafrost in the performance of Item 1, and an additional recovery of $1,609 is allowable under this opinion.