# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| King Aerospace, Inc. | )   ASBCA No. 57057 |
| | ) |
| Under Contract No. W58RGZ-05-C-0302 | ) |

APPEARANCES FOR THE APPELLANT:    Colin G. Martin, Esq.
   Marshall J. Doke, Jr., Esq.
   Elliot Strader, Esq.
   Joanne Early, Esq.
    Gardere Wynne Sewell LLP
    Dallas, TX

APPEARANCES FOR THE GOVERNMENT:    Raymond M. Saunders, Esq.
    Army Chief Trial Attorney
   Robert B. Neill, Esq.
   Trial Attorney

## OPINION BY ADMINISTRATIVE JUDGE MCILMAIL

## INTRODUCTION

The government contracted with appellant, King Aerospace, Inc. (King), for the maintenance of a fleet of fixed-wing, reconnaissance aircraft. King seeks additional compensation because, it contends, (1) the condition of the aircraft was inferior to that represented in the contract, (2) the government-furnished property promised in the contract was not all suitable or provided on time, (3) the contract negligently estimated the number of mechanics the work would require; and (4) the government's changes to flight schedules were excessive and without adequate notice. The Board held a six-day hearing; only entitlement is currently before the Board. We sustain the appeal, in part.

## FINDINGS OF FACT

*Background*

On 30 June 2005, the U.S. Army Aviation & Missile Command (government) awarded to King Contract No. W58RGZ-05-C-0302, a mostly fixed-priced contract for the maintenance of a fleet of aircraft based at Fort Bliss, Texas, and Camp Humphreys, Republic of Korea (R4, tab 1 at 1, 3). The government had issued a request for proposals for the contract work on 14 May 2004 (R4, tab 145 at 1). The fleet consists of eight DeHavilland DHC-7, four-engine, turbo prop, fixed-wing aircraft (including

one trainer), known as DASH-7, that are used in the "Airborne Reconnaissance Low" program, which conducts "low-profile" intelligence gathering (*see* Parties' Agreed Stipulations of Fact (stips.) 1-3, 25-26).

At the time of contract award, the incumbent maintenance contractor for the DASH-7 fleet was Avtel Services, Inc., which had performed those services, as either a subcontractor or the prime contractor, since 1992 (*see* stips. 7-8, 23). The contract term consists of a 60-day "phase-in" period through 31 August 2005, a 4-month base period, and 9 one-year option periods (R4, tab 1 at 5-101). King began performance of aircraft maintenance services on 1 September 2005 (stip. 30). On 26 May 2015, the parties submitted to the Board their stipulation that the government "has exercised all contract option years from 2006 to the present" (tr. 1/6; stip. 24).

On 10 August 2009, King presented to the contracting officer a certified claim in the amount of $22,592,555.28, incorporating by reference a 7 August 2008 Request for Equitable Adjustment (and a 29 May 2009 addendum to that request) that the contracting officer had denied on 27 July 2009 (R4, tabs 128, 132, 317). The contracting officer denied the claim on 22 October 2009 (R4, tab 134). King timely filed this appeal on 4 December 2009.

*Contract provisions*

Contract line item number (CLIN) 1 requires that King provide base operations support; CLIN 2 requires that King provide aircraft material (R4, tab 1 at 5). Each is for a fixed price (*id.*). In addition to that fixed-price work, the contract provides for several types of negotiated-price "Over and Above" (O&A) work (R4, tab 1 at 7-12). For example, CLIN 7AA provides for "Over and Above Maintenance Labor," and CLIN 7AB provides for "Over and Above Maintenance Parts/Materials" (R4, tab 1 at 9-10).

Other parts of the contract also address O&A work. Section H-2 provides that "[t]he Contractor may be required to perform Over and Above...Work for Maintenance, Elective Improvements, Engine Overhaul and Repair, and Deployments," and that "[t]he Contractor is NOT authorized to proceed with items ordered under O&A without prior approval from the Administrative Contracting Officer" (R4, tab 1 at 113). Section H-2 also provides that the contractor submit an O&A "Work Request" on which the contractor certifies "that the work is not covered by the basic fixed-price effort," that work requests would be definitized "based on direct...labor hours multiplied by the composite labor rate," and that "labor hours required" would be "negotiated between the Contractor and the [Administrative Contracting Officer]" (*id.*, ¶¶ (b), (d)).

2

Along the same lines, section I-72 of the contract incorporates by reference Department of Defense FAR Supplement (DFARS) 252.217-7028 (DEC 1991) (R4, tab 1 at 125), which defines O&A work as "work discovered during the course of performing overhaul, maintenance, and repair efforts that is...[w]ithin the general scope of the contract;...[n]ot covered by the line item(s) for the basic work under the contract; and...[n]ecessary in order to satisfactorily complete the contract." DFARS 252.217-7028(a)(1)(i-iii). DFARS 252.217-7028 further provides that "[u]pon discovery of the need for over and above work, the Contractor shall prepare and furnish to the Government a work request" that contains data "sufficient to...obtain the authorization of the Contracting Officer to perform the proposed work." *Id.* at (b)(1), (c). In addition, section I-56 incorporates by reference FAR 52.243-7, NOTIFICATION OF CHANGES (APR 1984), and requires 30 days' written notice by the contractor to the administrative contracting officer of "any Government conduct...that the Contractor regards as a change to the contract terms and conditions" (*see* R4, tab 1 at 125; FAR 52.243-7(b)).

Section 3.33 of the contract's statement of work provides that "[t]he Government...maintains the aircraft IAW [in accordance with] [Federal Aviation Administration (FAA)] Regulation Part 91, Part 43, and Part 145" (R4, tab 1 at 170). Section I-89 of the contract recites FAR clause 52.245-2, GOVERNMENT PROPERTY (FIXED-PRICE CONTRACTS) (MAY 2004), which provides that "[t]he Government shall deliver to the contractor, for use in connection with and under the terms of this contract, the Government-furnished property described in the Schedule or specifications together with any related data and information that the Contractor may request and is reasonably required for the intended use of the property" (*id.* at 132, ¶ (a)). That clause also provides that:

> If Government-furnished property is received by the Contractor in a condition not suitable for the intended use, the Contractor shall, upon receipt of it, notify the Contracting Officer...and, as directed by the Contracting Officer and at Government expense, either repair, modify, return, or otherwise dispose of the property. After completing the directed action and upon written request of the Contractor, the Contracting Officer shall make an equitable adjustment....

(*Id.*, ¶ (a)(3))

The Government Property clause further provides that "[i]f Government-furnished property is not delivered to the Contractor by the required time, the Contracting Officer shall, upon the Contractor's timely written request, make a determination of the delay, if any, caused the Contractor and shall make an equitable adjustment in accordance with

paragraph (h) of this clause" (R4, tab 1 at 132, ¶ (4)). Paragraph (h) provides that "[t]he right to an equitable adjustment shall be the Contractor's exclusive remedy," and that "[t]he Government shall not be liable to suit for breach of contract for...[a]ny delay in delivery of Government-furnished property" or "[d]elivery of Government-furnished property in a condition not suitable for its intended use" (R4, tab 1 at 134, ¶¶ (h)(1)-(2)). The contract includes "Appendix F," a list of government-furnished property (R4, tab 1 at 194-258). Some of the items on the list are designated as "U" (*id.*), meaning "unserviceable" (R4, tab 155 at 587 (question 45(a), and answer).

Finally, section 3.12 of the statement of work provides that "[t]he minimum manning level at Fort Bliss TX, and...in Korea shall contain no less than four (4) maintenance technicians per assigned aircraft" (R4, tab 1 at 158).

*Aircraft condition*

Section H-10 of the request for proposals provided:

> The Government will provide access to the aircraft records
> and will allow inspection of each aircraft to the offeror's
> [sic] planning to submit a proposal. Any offeror interested
> in this review shall contact the Government [procuring
> contracting officer] and submit a written request
> documenting the need to perform these inspections.

(R4, tab 145 at 79) On 21 May 2004, King requested in an email to the procuring contracting officer an opportunity to review the aircraft records (app. supp. R4, tab 317 at 205). During a pre-bid, July 2004 "Industry Day" held by the government that King and others attended, the government allowed attendees to review aircraft records, but only those of the trainer, and allowed only two hours for that review, which was not enough time for King to determine the trainer's condition (tr. 3/64-68, 75). Although there is no evidence that King submitted a written request to inspect the fleet, King and the Industry Day attendees were allowed to view only the trainer, and only during a 15-minute walk around that aircraft; they were not allowed to open any of the trainer's "access panels" (aerodynamic fairings that cover aircraft components to prevent interference from airflow), or to board the trainer (tr. 3/75).

In bidding for the contract, King relied upon section 3.33 of the statement of work, interpreting that (as well as other) provisions of the contract to mean that the aircraft had been maintained "to FAA standards" (tr. 5/59, 63-67). However, when it began performing the contract, King encountered (according to an aircraft maintenance expert (tr. 3/67) whose opinion the Board credits) conditions reflecting that the aircraft had not been properly maintained, causing King to have to perform unexpected work; these conditions included burnt "'de-ice' elements" (tr. 3/147; R4, tab 320.90 at 13),

deterioration of and other problems with de-ice "boots" (tr. 3/150-55; R4, tab 320.90 at 41, 49, 57), an improperly repaired propeller bulkhead (tr. 3/155; R4, tab 320.2 at 6), missing and unserviceable surge pressure relief tubes (tr. 3/160-62; R4, tab 320.3 at 16), a twisted drain line (tr. 3/163-65; R4, tab 320.52 at 10), a worn de-ice line and a worn bulkhead fitting (tr. 3/165; R4, tab 320.52 at 23), a bent fuel tank high pressure ejector pump tube (tr. 3/165-67; tab 320.52 at 30), unbalanced propellers (tr. 3/167-69; R4, tab 320.101 at 10), broken heat shields (tr. 3/169-72; R4, tab 320.103 at 25), and a fuel tank that would not transfer fuel in flight (tr. 3/156-60; R4, tab 320.2 at 16).[*] King's bid would have been "grossly higher" if it had known the actual condition of the aircraft before bidding for the contract (tr. 5/68-69). In its claim to the contracting officer, King alleged that Avtel had left the fleet in a "defective maintenance condition," and that:

> The [government's] failure to disclose known conditions of the aircraft led [King] to believe the [DASH-7] aircraft had been properly maintained in accordance with contract requirements and FAA Repair Station standards. In hindsight, this was not the case. [King] had a reasonable right to assume the aircraft had been maintained up to the standard required by the [request for proposals].

(App. supp. R4, tab 317 at 9, 78)

---

[*] Five of the fleet's eight aircraft were based at Fort Bliss, Texas; the other three were based in the Republic of Korea (stip. 25). The expert based his opinion upon a review of work orders related to the Fort Bliss aircraft (tr. 3/101-02, 143, 212). Although the expert's opinion does not take into account evidence regarding the Korea-based aircraft, we find that at least as a fleet, the aircraft had not been properly maintained.

In addition, there is some evidence that at least some of the conditions of which King complains were the result of normal wear, as opposed to improper maintenance: the expert testified that the wear to the de-ice line and bulkhead fitting was due to improper installation, but also that such wear occurs over time (tr. 3/165, 215). However, although in its post-hearing briefing, the government alludes generally to the age of the aircraft (gov't reply at 42), the government offers no alternative explanations for the specific conditions that King attributes (app. br. at 26-27, 40 n.19) to improper maintenance; the government apparently relies upon its position that whatever their cause, King should have sought relief under the contract's O&A provisions (*see* gov't reply at 25, 36, 38, 48). We take that as effectively conceding that, when it began performance, King encountered conditions reflecting that the aircraft had not been properly maintained, supporting our finding that such is the case.

5

*Government-furnished property and aircraft records*

During the request for proposals phase, the government informed potential offerors that Avtel would be responsible, by the completion of the phase-in period, to bring government-furnished property stock levels to the "initial quantity" listed on Appendix F, and to ensure that the property was in serviceable condition (R4, tab 155 at 586-87 (questions 43 and 45, and answers)). However, when King took over the contract, "Government furnished repair parts were in a state of disrepair," and "[s]upply levels of [government-furnished property] were below the expected transition levels" (app. supp. R4, tab 304 at 6, ¶ 2a). Some of the property was missing: either missing altogether or being repaired off site by other vendors (tr. 5/112-15), and not all of what was present was serviceable (tr. 3/7, 124-27; app. supp. R4, tab 200 at 8). Issues with unavailable or unserviceable government-furnished property caused King extra work: for example, when an aircraft mechanic opened an access panel to check a system and determined that the aircraft needed a part, the mechanic would look for the part among the government-furnished property; however, when the part was not available, it would have to be ordered, and, in the meantime, the aircraft panel would have to be put back together, then, after the part arrived, King would have to "do it all over again" (*see* tr. 3/103-07, 225-27). In addition, when King began performance, it was not provided all the aircraft records and drawings, in part because the government did not possess all those records and drawings (tr. 3/129-30, 4/154). King had to spend time "in the effort to acquire such drawings and information required to assure the airworthiness of individual aircraft" (app. supp. R4, tab 200 at 2).

On 12 October 2005, the government approved a $3,810,000 work request that King submitted for additional aircraft parts as "Over and Above Elective Improvements" (R4, tab 141 at 2007). The government also approved a work request in the amount of $7,660.80 for labor associated with locating and recovering missing government-furnished property (stip. 33).

*Mechanics to aircraft ratio*

In its claim, King stated the following:

> [King] currently has 72 full time, budgeted employees to perform the...contract and has determined the contract requires 94 personnel to satisfy all contract requirements, as well as accommodate the factors and constructive changes identified in the [request for equitable adjustment]. This [request for equitable adjustment] raises the mechanics to aircraft ratio from the current 4:1 to a 7:1 ratio.

(App. supp. R4, tab 317 at 8)

6

## DECISION

*Whether King is entitled to additional compensation for aircraft maintenance and repair that was required because the condition of the aircraft was inferior to that represented in the contract*

King asserts that it is entitled to additional compensation because the condition of the aircraft when King commenced contract performance was inferior to that represented in the contract (app. br. at 33). In order for a contractor to prevail on a claim of misrepresentation in a government contract, the contractor must show that the government made an erroneous representation of a material fact that the contractor honestly and reasonably relied on to the contractor's detriment. *T. Brown Constructors, Inc. v. Pena*, 132 F.3d 724, 728-29 (Fed. Cir. 1997); *Hartman Walsh Painting Co.*, ASBCA No. 57832, 12-1 BCA ¶ 35,026 at 172,134. A misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so. *T. Brown*, 132 F.3d at 729; *Martin Edwards & Associates, Inc.*, ASBCA No. 57718, 15-1 BCA ¶ 35,914 at 175,569.

King meets that test. First, we reject the government's position (gov't br. at 56) that "the government provided no representations concerning the condition of any of the aircraft"; rather, we hold that the government erroneously represented the condition of the aircraft. Section 3.33 of the contract's statement of work states that "[t]he Government...maintains the aircraft [in accordance with] FAA Regulation Part 91, Part 43, and Part 145." Most relevant to this appeal is Part 43, which governs aircraft maintenance, preventative maintenance, rebuilding, and alteration (14 C.F.R. Part 43), and, in particular, section 43.13 (14 C.F.R. § 43.13), which states, at subsection (a), in part (emphasis added):

> Each person performing maintenance, alteration, or preventive maintenance on an aircraft, engine, propeller, or appliance shall use the methods, techniques, and practices prescribed in the current manufacturer's maintenance manual or Instructions for Continued Airworthiness prepared by its manufacturer, or other methods, techniques, and practices acceptable to the Administrator, except as noted in § 43.16. He shall use the tools, equipment, and test apparatus necessary *to assure completion of the work in accordance with accepted industry practices.*

Subsection (b) states, in part (emphasis added):

7

> Each person maintaining or altering, or performing preventive maintenance, shall do that work in such a manner and use materials of such a quality, that the condition of the aircraft, airframe, aircraft engine, propeller, or appliance worked on *will be at least equal to its original or properly altered condition* (with regard to aerodynamic function, structural strength, resistance to vibration and deterioration, and other qualities affecting airworthiness).

Given that regulatory language, we interpret the statement in the contract that the government "maintains the aircraft [in accordance with] FAA Regulation...Part 43" as a representation that work on the aircraft was completed in accordance with accepted industry practices, and that the condition of the aircraft and its components was at least equal to its original or properly altered condition. However, when King took over, it discovered that not all work on the aircraft had been completed in accordance with accepted industry practices, and that the condition of the aircraft and its components was not all "at least equal to its original or properly altered condition." For example, King discovered burnt "de-ice" elements, deteriorated de-ice "boots," an improperly repaired propeller bulkhead, missing and unserviceable surge pressure relief tubes, a twisted drain line, a bent fuel tank high pressure ejector pump tube, unbalanced propellers, broken heat shields, and the failure of a fuel tank to transfer fuel during a flight. Based upon the evidence before us, we find that none of those conditions is in accordance with accepted industry practices, and none is a condition at least equal to its original or properly altered condition.

Second, the government's misrepresentation was material. Because the contract was for maintenance and repair of the aircraft, that work on the aircraft was being completed in accordance with accepted industry practices, and that the condition of the aircraft and their components was at least equal to their original or properly altered conditions would have been likely to induce a reasonable person to manifest his assent to take over the responsibility of maintaining and repairing that aircraft.

Third, King honestly relied on the misrepresentation to its detriment: In bidding for the contract, King relied upon section 3.33 of the statement of work, which includes the representation that the government maintained the aircraft in accordance with FAA Regulation Part 43; that bid would have been higher if King had known the actual, substandard condition of the aircraft before bidding.

Fourth, King's reliance was reasonable. We find no other contrary representation of the aircraft's condition. Although the government points (with almost no elaboration) to other sources (gov't br. at 56-57), it does not demonstrate how any of them contradicts the contract's representation that the government

8

maintained the aircraft in accordance with Part 43. The flight history summary that the government points to (gov't br. at 7, ¶ 10; gov't reply at 56) contains no such representation (R4, tab 145 at 304-08), and the thesis regarding the DASH-7 project that it points to is dated December 2001 (R4, tab 144 at 1), well before the May 2004 issuance of the request for proposals and the June 2005 contract award.

The government also points (gov't br. at 56) to the opinion of the United States Court of Federal Claims in *Avtel Services, Inc. v. United States*, 70 Fed. Cl. 173 (2006), a pair of consolidated bid protest actions in which King intervened, and which concerned allegations by Avtel that King had obtained competitive sensitive and proprietary information during the procurement process, providing King with an unfair advantage in the competition for the contract. *Id.* at 181. The government contends that "[b]ased on findings made by the Court of Federal Claims, [King] is collaterally estopped from claiming that it did not know the condition of the aircraft and the related documentation when it submitted its proposal" (gov't br. at 56-57). In support of its contention the government cites a single page of the court's opinion (70 Fed. Cl. at 193), but we find nothing on that page or elsewhere in the opinion that contradicts the representation in the contract that the government maintained the aircraft in accordance with FAA Regulation Part 43. The government quotes the court as referring to "King's meeting with Donald Wilbanks, an Avtel employee" (gov't br. at 57), but does not even attempt to demonstrate that, at that meeting, King learned the actual condition of the aircraft. The government also contends (gov't br. at 55) that King should have inspected the aircraft before submitting its proposal, but it was not incumbent upon King, prior to submitting its bid and entering into the contract, to conduct its own investigation in order to ascertain the truth or falsity of the government's positive assertions regarding the maintenance and condition of the aircraft. *Cf. Morrison-Knudsen Co. v. United States*, 345 F.2d 535, 539 (Ct. Cl. 1965) (differing subsurface site condition).

Finally, King relied upon the misrepresentation to its detriment. King repaired or otherwise addressed examples of the aircraft's substandard condition that it inherited from Avtel, including burnt "'de-ice' elements," deteriorated de-ice "boots," improperly repaired propeller bulkhead, missing and unserviceable surge pressure relief tubes, twisted drain line, bent fuel tank high pressure ejector pump tube, unbalanced propellers, broken heat shields, and fuel tank issue. Consequently, King is entitled to recover for the government's misrepresentation.

Beyond that, we cannot say. For example, there is no evidence of a comprehensive inspection of the fleet contemporaneous with King taking over maintenance, so we do not know whether all the aircraft were in substandard condition when King took over, and to what extent. Nevertheless, the preponderance of the evidence is that upon taking over, King was left holding a bag of maintenance and repair issues that were inconsistent with the aircraft condition represented in the

9

contract. Therefore, we find that King is entitled to compensation for having to deal with those issues, although the amount of compensation is not before us in this, the entitlement phase.

*Whether King is entitled to additional compensation related to government-furnished property*

King asserts that it is entitled to additional compensation for costs incurred because, it contends, the government "failed to deliver the [government-furnished property] identified in Appendix F at the time [King] began contract performance on September 1, 2005" (app. br. at 43). Section I-89(a) of the contract (FAR 52.245-2(a)) provides for an equitable adjustment in the event that government-furnished property is not delivered to the contractor on time, or if that property is received by the contractor in a condition not suitable for the intended use. "Government-furnished property" is whatever property the contract describes as property that will be furnished to the contractor with related data and information as may be required for the intended use of the property. *Northwest Marine, Inc.*, ASBCA No. 43673, 95-2 BCA ¶ 27,888 at 139,132. Although government-furnished property need not be perfect, it must at least be suitable for its intended use, and it must be delivered in a timely manner. *Id.* Government-furnished property may include drawings and other technical information. *See id.* The provision of a discrepant data package can impose costs upon a contractor. *See id.* at 139,133.

Here, the government promised that the property listed in Appendix F would be available in serviceable condition by the end of the phase-in period. However, not all the listed items were available by then, and not all what was available was serviceable. As a result, King incurred costs. At a minimum, problems with government-furnished property at times required King to "redo" maintenance or repair work that it would have had to perform only once if all the listed items had been available and serviceable when King first attempted to perform the work. Consequently, King is entitled to an equitable adjustment arising from issues with unavailable and unserviceable government-furnished property. *See Northwest Marine,* 95-2 BCA ¶ 27,888 at 139,133.

In addition, when King took over from Avtel, the aircraft drawings and historical records were incomplete, and King spent time attempting to acquire drawings and other information required to assure the airworthiness of the aircraft. Because that effort entailed costs, King is entitled to additional compensation.

We need not decide in this, the entitlement phase, whether, as a result of government-furnished property issues, King is entitled to an increase in CLIN 1, CLIN 2, or both. Although we agree with the government that section I-89(h) of the contract (FAR 52.245-2(h)) precludes King from recovering breach damages arising from government-furnished property issues, we reject the suggestion (gov't reply at 40) that

10

because King alleges that the problems with government-furnished property constitute a breach, it is not entitled to recover anything. King invokes section I-89 of the contract (FAR 52.245-2) (app. br. at 42-43), which provides for an equitable adjustment in the event of late or unsuitable government-furnished property. King is entitled to such an equitable adjustment.

*The government's other defenses*

In opposing King's claims for additional compensation due to aircraft condition and problems with government-furnished property, the government raises several other issues, some, apparently, with respect to both of those claims. We reject those arguments. The government contends that King is not entitled to additional compensation because its actual labors hours are fewer than it proposed when bidding for the contract (gov't reply at 6, 35). Essentially, the government's position is that in performing this mostly fixed-price contract, King spent less than it expected it would, and, therefore, is not entitled to any additional compensation. We disagree. We have found that King performed work it should not have expected to perform; as King points out (app. reply at 18), the measure of recovery for such work is the cost of that work. *See Santa Fe Engineers, Inc.*, ASBCA No. 48331, 95-1 BCA ¶ 27,505 at 137,076; *see also Tripod, Inc.*, ASBCA No. 25104, 89-1 BCA ¶ 21,305 at 107,442.

The government contends that the contract's O&A provisions cover any extra work on the aircraft, but that King waived any compensation for such work because it did not comply with those provisions' notice requirements (gov't br. at 42-43). However, to rely on such notice provisions, the government must demonstrate that it was prejudiced by a lack of notice. *See Grumman Aerospace Corp.*, ASBCA No. 46834 *et al.*, 03-1 BCA ¶ 32,203 at 159,185. The government does not do so here; there is no indication, for example, that the government would have instructed King not to fix the problems it inherited from Avtel. Similarly, citing the Changes clause, the government contends that King failed to comply with that clause's 30-day notice requirement, and so waived any right to recovery (gov't br. at 54). However, again, to prevail upon such an argument, the government must show prejudice. *Precision Standard, Inc.*, ASBCA No. 54027, 03-2 BCA ¶ 32,265 at 159,600. The government has not even attempted to do so.

The government also contends that we do not possess jurisdiction to entertain any breach of contract claim because King did not present a breach of contract claim to the contracting officer (gov't br. at 46). If the government means that we do not possess jurisdiction to entertain King's aircraft condition claim, we disagree. The Board possesses jurisdiction to entertain claims that arise from the same operative facts as those presented to the contracting officer, claim essentially the same relief, and merely assert differing legal theories for that recovery. *Environmental Chemical Corp.*, ASBCA No. 58871, 15-1 BCA ¶ 36,110 at 176,289. The allegations before us that the contract did not disclose the actual, substandard condition of the aircraft are the same

11

operative facts set forth in the claim to the contracting officer, and there is no indication that King seeks in this appeal anything more than essentially the same relief it sought from the contracting officer. Accordingly, we possess jurisdiction to entertain King's aircraft condition claim, whatever label King attaches to it.

The government contends that King's performance of the contract waives any breach claim, citing *Alliance Roofing & Sheet Metal, Inc.*, ASBCA No. 59663, 15-1 BCA ¶ 35,981 at 175,806. However, that case is distinguishable. The contractor in *Alliance* acquiesced to the government's demand to provide a warranty for a roof; we held that acquiescence waived any breach claim, and that the contractor's claim was a request for an equitable adjustment. *Id.* at 175,805. Here, King complains not that the government demanded that it perform extra-contractual work, but that the contract misrepresented the condition of the aircraft; such a contract misrepresentation claim is one of breach. *See Morrison-Knudsen*, 345 F.2d at 539.

Finally, we disagree with the government's contention (gov't br. at 43; gov't reply at 41) that because the government approved a $3.8 million work request for additional aircraft parts, King is not entitled to an equitable adjustment for issues arising from problems with government-furnished property. King has demonstrated that unavailable or unserviceable government-furnished property increased its costs because, at a minimum, it had to perform repair or maintenance work more than once. The $3.8 million for additional parts did not compensate King for those costs. Nevertheless, in a quantum phase of these proceedings, we will be alert to any possibility of double recovery regarding government-furnished property.

> *Whether King is entitled to additional compensation for the contract's requirement that the contractor provide a minimum of four mechanics per aircraft*

King asserts that it is entitled to additional compensation for costs incurred because the contract required a minimum of four mechanics per aircraft, which King contends is a negligent government estimate because more than four mechanics per aircraft were required to perform the contract work. The government contends that the Board does not possess jurisdiction to entertain that claim, because, the government contends, King has not presented that claim to the contracting officer. For the Board to possess jurisdiction to entertain a claim, the claim must first have been presented to the contracting officer. *CDM Constructors, Inc.*, ASBCA No. 59524, 15-1 BCA ¶ 36,097 at 176,241. We agree with the government.

While a Contract Disputes Act claim need not be submitted in any particular form or use any particular wording, it must contain a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim. *Air Services, Inc.*, ASBCA No. 59843, 15-1 BCA ¶ 36,146 at 176,426. In its claim,

12

King states that it "raises the mechanics to aircraft ratio from the current 4:1 to a 7:1 ratio" (app. supp. R4, tab 317 at 8), but does not relate or connect that statement to section 3.12 of the statement of work, which sets forth the 4:1 minimum manning requirement. Nor does the claim state that the government negligently estimated the manpower required for the contract work. For these reasons, the claim does not contain a clear and unequivocal statement that gives the contracting officer adequate notice of the "negligent estimate" claim for which King seeks additional compensation before the Board. Accordingly, King did not present its "negligent estimate" claim to the contracting officer, and we do not possess jurisdiction to entertain that claim. Therefore, we dismiss that claim for lack of jurisdiction, without prejudice.

*Whether King is entitled to additional compensation for flight schedule changes*

Invoking the implied duty to cooperate and not delay or hinder performance, King asserts that it is entitled to additional compensation for costs incurred because of excessive flight schedule changes by the government; specifically, King contends that the government breached its duty by not including King in flight scheduling meetings, and by altering flight schedules for reasons not related to mission or weather issues (app. br. at 65 n.1). We agree with the government that King is not entitled to such compensation.

Parties to a contract have a duty of good faith and fair dealing that neither will conduct themselves in a way that will hinder or delay the contractual performance of the other and failure to fulfill that duty constitutes a breach of contract; however, this duty may not expand a party's contractual duties beyond those in the express contract. *AEON Group, LLC*, ASBCA Nos. 56142, 56251, 14-1 BCA ¶ 35,692 at 174,756-57. And although the government must avoid actions that unreasonably cause delay or hindrance to contract performance, a contractor alleging a breach of the implied duty must demonstrate that the government acted arbitrarily or unreasonably. *See C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1542 (Fed. Cir. 1993).

Here, King fails to demonstrate that the duty of good faith and fair dealing required the government to include King in its flight scheduling process. King points to no such requirement in the contract; therefore, we hold that imposing such a requirement through the implied duty of good faith and fair dealing would expand the government's contractual duties to King beyond those in the express contract. In addition, King fails to demonstrate that the government changed flight schedules in an arbitrary or unreasonable manner. Indeed, King's argument on this issue is anecdotal; in its briefing, King fails to point to any specific example (by date, for instance) in which the government arbitrarily or unreasonably changed a flight schedule in a manner that hindered King's performance.

## CONCLUSION

For these reasons, we sustain the appeal, in part. The matter is remanded to the parties for negotiation of quantum related to the contract's misrepresentation of the condition of the aircraft and to issues with government-furnished property, and if necessary, a contracting officer's decision upon those issues. King's "negligent estimate" claim is dismissed, for lack of jurisdiction, without prejudice. Otherwise, the appeal is denied.

Dated: 26 July 2016

TIMOTHY P. MCILMAIL
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 57057, Appeal of King Aerospace, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

14